Minnie **DORFMAN**

v.

**FIRST BOSTON CORP. et al.**

**JUSTER, INC.**

v.

**FIRST BOSTON CORP. et al.**

**Civ. A. Nos. 70–1845, 71–269.**

United States District Court, E. D. Pennsylvania.

Feb. 6, 1976.

Mitchell A. Kramer, Kramer & Salus, Philadelphia, Pa., Herbert I. Deutsch, New York City, for plaintiff class.

David Berger, P. A., Blank, Rome, Klaus & Comisky, Farage & Shrager, Modell, Pincus, Hahn & Reich, Philadelphia, Pa.

## OPINION

JOSEPH S. LORD, III, Chief Judge.

### I. BACKGROUND

A number of lawyers have filed petitions for counsel fees in connection with the settlement of these two cases. Both cases arise out of the financial collapse in June 1970 of the Penn Central Trans-

portation Company, all of whose stock was held by the Penn Central Company.

The complaint in *Dorfman v. First Boston Corporation, et al.* was filed on July 7, 1970, and the complaint in *Juster, Inc. v. First Boston Corporation, et al.* on September 28, 1970 (hereafter collectively referred to as *"Dorfman-Juster"*).[1] The two cases were brought by bondholders of the Pennsylvania Company (hereafter "Pennco"), a subsidiary of the Transportation Company. They initially came before the Judicial Panel on Multidistrict Litigation as part of the massive *In Re Penn Central Securities Litigation,*[2] MDL Docket No. 56 (hereafter *"MDL 56"*). The Panel referred *MDL 56,* of which *Dorfman-Juster* was then a part, to us. *In Re Penn Central Securities Litigation,* 322 F.Supp. 1021 (Jud.Pan.Mult.Lit.1971). On April 21, 1971, we severed the present cases from the rest of the Penn Central Securities cases.[3]

Earlier proceedings in these cases are reported in two previous opinions. We will only briefly review the facts contained in those decisions. Plaintiffs, Minnie Dorfman and Juster, Inc., brought suit pursuant to various provisions of the Securities Act of 1933 and the Securities Exchange Act of 1934. They sought damages for their losses in the purchase of nine percent Sinking Fund Debentures issued by Pennco.

In January, 1972, we granted defendants' motion to dismiss as to a number of claims, and denied their motion as to claims asserted under section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1970), and sections 17(a)(1) and (a)(3) of the Securities Act of 1933, 15 U.S.C. § 77q(a) (1970). *Dorf-*

*man v. First Boston Corporation,* 336 F.Supp. 1089 (E.D.Pa.1972). Later, plaintiffs were certified as class representatives pursuant to F.R.Civ.P. 23(a) and (b)(3). *Dorfman v. First Boston Corporation,* 62 F.R.D. 466 (E.D.Pa.1974). The class which plaintiffs represented was defined as "the class of debenture holders who purchased in reliance on the December 16, 1969 offering circular * * *." *Id.* at 478.

*Dorfman-Juster* was settled, along with the actions in *MDL 56,* on December 2, 1974. The settlements occurred simultaneously because of the defendants' insistence throughout the course of these cases that any settlement would have to be "global" in nature. From the global settlement fund, $2 million was allocated to the *Dorfman-Juster* class. After a hearing at which no objections were raised, we approved the settlement in *Dorfman-Juster* on August 25, 1975.[4]

On February 25, 1975, we issued Post Settlement Order No. 1 requiring, *inter alia,* that all petitions for attorney fees be filed by February 28, 1975. Mitchell Kramer, Esq., counsel for Minnie Dorfman, and Herbert Deutsch, Esq., counsel for Juster, Inc., (hereafter "class counsel") filed a joint petition for counsel fees and reimbursement of expenses on February 28, 1975.[5] Notice of the *Dorfman-Juster* settlement and of the class counsel petition for attorney fees was mailed to all members of the class on or before March 5, 1975, and published in the *New York Times* and *Wall Street Journal* on March 12, 1975.

On May 9, 1975, petitioners David Berger, P.A., Blank, Rome, Klaus & Comisky, Farage & Shrager, and Modell, Pincus, Hahn & Reich (hereafter "Berger *et*

---

1. The complaint in *Juster, Inc. v. First Boston Corporation, et al.* was filed in the Southern District of New York.

2. The numerous suits before the Panel included actions by both stockholders and bondholders of the various Penn Central companies.

3. The Multidistrict Panel, in referring these cases, specifically recognized the possibility of factual differences and left open separate

treatment of *Dorfman-Juster. In Re Penn Central Securities Litigation,* 322 F.Supp. 1021, 1022–23 (Jud.Pan.Mult.Lit.1971).

4. Recently we also signed an order approving the settlement in *MDL 56.*

5. A joint supplemental petition was filed on June 12, 1975.

*al."*), filed a motion to consolidate hearings on fee petitions. These petitioners, who represent many of the plaintiffs in *MDL 56,* sought to consolidate the hearing on attorney fees in this case with the hearing in *MDL 56.* On May 30, 1975 we denied that motion. The hearing on class counsel's fee petition was held on July 2, 1975 at which time there was no objection to the fee request.

Berger *et al.* then filed, on July 14, 1975, a petition for counsel fees. It is this petition with which we deal first.

## II. BERGER ET AL.

These petitioners [6] seek an award of attorney fees amounting to 35 percent of the fees which we award to class counsel. They represent no plaintiff in this litigation. However, their claim is based on the assertion that it was partially through their efforts that the fund in *Dorfman-Juster* was established. We cannot agree with petitioners and will dismiss their petition.

In reaching our conclusion, we felt it unnecessary to hold an evidentiary hearing. *See Alpine Pharmacy, Inc. v. Chas. Pfizer & Co., Inc.,* 481 F.2d 1045, 1053 (C.A.2, 1973).[7] We have observed the progress of both *Dorfman-Juster* and *MDL 56* since their infancy. We are completely familiar with the facts relevant to the Berger *et al.* petition. Further, we have available the entire records in these cases, as well as two affidavits executed by Raymond Denworth, Esq., who acted as defendants' liaison counsel and was involved in the day-to-day management of the defense and the settlement negotiations in both *Dorfman-Juster* and *MDL 56.*

Petitioners' position is that although they did not formally represent plaintiffs in *Dorfman-Juster,* their efforts during settlement negotiations in large part were responsible for establishing the global settlement fund. They contend that the Supreme Court's decision in *Sprague v. Ticonic National Bank,* 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184 (1939) gives this court the power to make an award of counsel fees to them. Mr. Justice Frankfurter, speaking for the Court in *Sprague* stated:

"Whether one professes to sue representatively or formally makes a fund available for others may, of course, be a relevant circumstance in making the fund liable for his costs in producing it. But when such a fund is for all practical purposes created for the benefit of others, the formalities of the litigation—the absence of an avowed class suit or the creation of a fund, as it were, through *stare decisis* rather than through a decree—hardly touch the power of equity in doing justice as between a party and the beneficiaries of his litigation." 307 U.S. at 167, 59 S.Ct. at 780.

 We have no doubt that this court has the *power* to award attorney fees to counsel who do not formally represent any of the parties.[8] Nevertheless, before exercising our discretion to use this power, we must first be convinced that such an award would be equitable under the circumstances.

Petitioners argue that the Second Circuit's opinion in *Alpine Pharmacy, Inc. v. Chas. Pfizer & Co., Inc., supra,* an antibiotic drug price-fixing case, is directly on point with the present case. Petitioners have cited no other cases in which awards similar to this have been made.[9]

---

6. Actually, Berger *et al.* and class counsel are all petitioning for fees. For convenience Berger *et al.* will be referred to as "petitioners" and Kramer & Deutsch as "class counsel."

7. Based on the reasons set out in the body of the opinion we do not think that the Court of Appeals' decision in *Lindy Brothers Builders Inc. v. American Radiator & Standard Sanitary Corp.,* 487 F.2d 161, 169 (C.A.3, 1973), commands a different result.

8. *See generally* J. Dawson, *Lawyers and Involuntary Clients: Attorney Fees From Funds,* 87 Harv.L.Rev. 1597 (1974).

9. We are aware of one other case in which the court acted to shift fees among attorneys for plaintiffs. In *Doherty v. Bress,* 104 U.S.App. D.C. 308, 262 F.2d 20 (1958), *cert. denied,* 359 U.S. 934, 79 S.Ct. 649, 3 L.Ed.2d 636 (1959), there were numerous plaintiffs' claims, all based on the same aircraft accident. Two of

In order to discuss intelligently this argument, it will be necessary for us to relate in some detail the facts of that case.

*Alpine* involved an appeal from an order of Judge Inzer B. Wyatt of the Southern District of New York approving a plan of distribution for certain claimants and awarding attorney fees. The case arose out of the massive antibiotic multidistrict antitrust litigation.

The plaintiffs in the *Alpine* case fell into a number of subclasses. However, there were three essential groups: (1) various governmental bodies which had directly or indirectly purchased antibiotics, (2) wholesale and retail druggists, and (3) individual consumers. There, as here, defendants insisted upon a global settlement which would encompass all plaintiffs' claims. In 1969 a settlement offer of $100 million was made; acceptance required the approval of all of the subclasses. This required working out an equitable allocation of the $100 million fund among all of the plaintiff classes.

The attorney who had been the chief negotiator of the global settlement, David Shapiro,[10] thereupon set out to gain the approval of the druggist class. He suggested an allocation of $3 million to the druggist class. Counsel for the druggists, who had no part in the global settlement negotiations, approved the global settlement figure, but rejected the $3 million allocation for their class. Their position was that their class should receive an allocation of $40 million from the settlement fund.

After extensive negotiations among defendants, Shapiro, and counsel for the druggists, it was agreed that the druggist class would be allocated $3 million plus the interest on the entire settlement fund for a period of time. The latter amount was an additional contribution to the settlement fund by defendants, because the interest would be accumulated for a period of time before defendants were required to establish an escrow account.

Shapiro thereupon petitioned the court for an award of attorney fees from the $3 million allocated to the druggists. Judge Wyatt approved an award to Shapiro even though he had never formally represented any of the druggists in the litigation. In making the award, Judge Wyatt found that "[i]t is certain that the efforts of Shapiro were largely responsible for the creation of the $3,000,000 fund allocated to the [druggist] class." 481 F.2d at 1057. The Court of Appeals

the cases were permitted to proceed as "test cases," and it was stipulated that the results would be binding on all parties. At trial, defendants' liability was established, which greatly simplified the task of one Doherty, a lawyer for one of the non-test case plaintiffs. The court, acting on the petition of the lawyer who had established defendants' liability in the "test cases," awarded him 35 percent of Doherty's fee from his client. While the facts of that case are not particularly relevant to the case at hand, Professor Dawson's comments on *Doherty* are both instructive and ironic in light of today's case.

"There is some irony in the thought that the *Greenough-Pettus* [the predecessors of *Sprague*] machinery of the 'common fund,' which has extracted so much from strangers for the enrichment of the legal profession, can be reversed and turned against other lawyers to generate such internecine strife. In the end the decision may turn out to be merely a freak. It can be explained in part by the statutory power of the trial judge to determine what shares all the lawyers would be given in the tort judgment against the government [28 U.S.C. § 2678 (1970)]. Surely much depended also on the express agreement by all plaintiffs and defendants that the test cases would determine the issue of fault. *Doherty v. Bress* has seldom been cited subsequently and seems almost to have dropped out of sight. I have found only one case in which a lawyer has used it in an active effort to redivide the lawyers' own pie. This effort failed, the reasons given being that the lawyers concerned had represented distinct groups of clients whose contentions differed, were at times mutually hostile, and contributed in ways that were hard to measure. *[Schmidt v. McCarthy* [125 U.S.App.D.C. 131], 369 F.2d 176 (D.C. Cir. 1966).] So it maybe [*sic*] that the gate left ajar by *Doherty v. Bress* will lead nowhere. But who can be sure the gate is not locked? (Citations omitted.)"
*Attorney Fees From Funds*, note 8, *supra*, at 1651.

**10.** Shapiro was counsel for some, but not all, of the government plaintiffs.

affirmed the award as not being an abuse of discretion. The court felt that since Shapiro had created the $3 million fund, the realities, rather than the formalities, of the litigation should be the relevant consideration. 481 F.2d at 1057.

Petitioners, analogizing themselves to Shapiro, claim that they similarly should be awarded fees from the settlement fund which they participated in establishing.

■ Our reading of the opinions of Judge Wyatt in *State of West Virginia v. Chas. Pfizer & Co.,* 314 F.Supp. 710 (S.D.N.Y.1970), *aff'd,* 440 F.2d 1079 (C.A.2), *cert. denied,* 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971), and the Second Circuit in *Alpine Pharmacy, Inc. v. Chas. Pfizer Co., supra,* brings us to the conclusion that there were a number of factors which contributed to Judge Wyatt's conclusion that Shapiro's efforts had created the settlement fund for the druggists. A comparison of these factors with the facts of this case leads us to a different conclusion.[11]

■ First, the Court of Appeals noted that Shapiro had been chief negotiator of the global settlement; none of the attorneys for the druggists took part in these negotiations. In the present case,

negotiations were carried on separately by petitioners and class counsel with the defendants. Indeed, one of the defendants in *Dorfman-Juster,* First Boston Corporation, was not a defendant in any of the *MDL 56* cases. This defendant contributed substantially to the overall fund, although its contribution was only because of *Dorfman-Juster* and the efforts of class counsel.

Although at one point early in these cases there was some confusion about petitioners' authority to represent *Dorfman-Juster* plaintiffs at settlement negotiations, any confusion was totally dissipated in a conference before us in the early summer of 1973.[12] At that time petitioners agreed that in future negotiations they would speak only for plaintiffs in *MDL 56.* At a settlement conference before us in April, 1974, attended by petitioners and class counsel, a substantial settlement offer was tendered by defendants. Thereafter, negotiations were carried on, with petitioners representing plaintiffs in *MDL 56* and class counsel representing plaintiffs in *Dorfman-Juster.*[13]

The situation that then evolved was totally unlike that in *Alpine.* There, the

---

**11.** We wish to emphasize that the decision on attorney fees is one which is initially left to the trial judge's discretion. *See, e. g., Hall v. Cole,* 412 U.S. 1, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973). In exercising that discretion, the trial judge must, and naturally will, take into account all of the facts and circumstances of the case. For this reason we think it especially important to point to those facts and circumstances which we feel Judge Wyatt relied on.

**12.** Class counsel throughout this litigation consistently took the position—in settlement negotiations, conferences, and in letters to petitioners—that no one was authorized to speak for their clients except for themselves.

**13.** The efforts of class counsel which ultimately contributed to the final settlement are sketched out below. Initially, counsel took the position that their clients would be best off if preparation for trial went ahead. Consequently, counsel conducted the following discovery:

(a) Interrogatories were prepared and served on all defendants and the responses were analyzed;

(b) Document requests were prepared and served and the documents produced were analyzed;

(c) Requests for admissions were prepared and served and the responses were analyzed;

(d) A number of witnesses were interviewed; and

(e) Several depositions were taken.

In many cases it was necessary for class counsel to make motions to compel before discovery could be obtained. Subsequently, class counsel (along with petitioners) attended numerous settlement meetings after the settlement conference before us in April, 1974. It was these meetings which ultimately led to the global settlement offer which was accepted and approved. Among other aspects of this case which class counsel handled are: arguing for severance of *Dorfman-Juster* from *MDL 56* both before the Judicial Panel on Multidistrict Litigation and us, briefing and arguing against defendants' motion to dismiss, and twice arguing class action motions before this court.

entire settlement of $100 million was imperiled by the druggists' claim for $40 million. "Insistence on that figure would almost certainly have destroyed any chance of settlement." [14] Many of the other plaintiffs "were of the view that these purchasers [the druggists] were not entitled to any reimbursement." *State of West Virginia v. Chas. Pfizer & Co., supra,* 440 F.2d at 1084. And Judge Wyatt expressed serious doubt as to the validity of their claims.[15] What Shapiro did was (1) obtain for the druggists a "nuisance value" [16] for a claim that may have had no value; and (2) save the global settlement of $100 million.

A far different situation obtained here. No one seriously questioned the substantive validity of the *Dorfman-Juster* claim after our rulings on the motions, *see supra.* It was, in itself, a substantial part of the global settlement. It was not a "nuisance value" claim, but one based on solid substance. And it was a claim that class counsel repeatedly insisted would not be settled for less than $2 million, a position known at all times to petitioners and defendants. Raymond Denworth, Esq., liaison counsel for defendants, stated in an affidavit, "At some point in those conferences [after the settlement conference of April, 1974 before us], counsel for plaintiffs in *Dorfman-Juster* stated that, in order to settle their cases, they would require a total fund of $2 million, and did not care from what source those funds came, or how they were allocated." [17]

After the global fund of $10 million materialized, the problem of allocation arose. Because of disagreements among plaintiffs in *MDL 56,* it was left to the court to allocate the fund to the subclasses. However, the *Dorfman-Juster* allocation was not made by the court; it was decided upon in negotiations between class counsel representing plaintiffs here, and petitioners representing plaintiffs in *MDL 56.*[18] Class counsel continued to insist upon an allocation of $2 million to their clients. They got it.

In sum, we have concluded that class counsel were in part responsible for the birth of the $10 million global fund; they were solely responsible for negotiating the allocation of $2 million with petitioners who represented at that point an adverse class. This simply is not a case, as was *Alpine,* where counsel for one class of plaintiffs has ridden the coattails of another to settlement.

Class counsel argue that in any event, the petition was not timely filed. On February 25, 1975, we ordered that petitions for counsel fees be filed not later than February 28. The Berger *et al.* petition was filed on July 14, 1975, nineteen weeks after the deadline, four months after the national publication of notice to the *Dorfman-Juster* class, and twelve days after the fee hearing itself.

---

14. Wyatt, J. approving the antibiotic drug price-fixing case (*Alpine*) settlement, *sub nom., State of West Virginia v. Chas. Pfizer & Co.,* 314 F.Supp. 710, 745 (S.D.N.Y.1970), *aff'd,* 440 F.2d 1079 (C.A.2), *cert. denied,* 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971).

15. This was in part because of the substantive weakness of the druggists' claims. Judge Wyatt, after discussing the applicability of the "passing-on defense," 314 F.Supp. at 745–46, observed:

 "Whatever the correct answer to this riddle may be, it is difficult to see in these cases any real damage to [the druggists].
 "The attitude of the members of the [druggist] class indicates no real damage to them."
 *Id.* at 746.

16. 440 F.2d at 1084.

17. Answer to Petition for Counsel Fees, Affidavit of Raymond Denworth ¶ 12. This fact is substantiated by other documents in the record before us.

18. Petitioners allege that they have expended over 17,000 hours in prosecuting this suit. Every one of those hours was spent representing the interests of plaintiffs in *MDL 56.* Indeed, as fully expected, petitioners' motions for counsel fees in *MDL 56* (presently before us) detail well in excess of 17,000 hours for which they seek compensation from the *MDL 56* settlement fund. The justice of awarding what would amount to duplicate fees to petitioners by taking fees away from what this court determines class counsel have earned and deserve, escapes us.

However, in view of our conclusion on the merits, we find it unnecessary to consider this question. Similarly, since we have concluded that petitioners are not entitled to any fee from any source, we obviously need not consider whether it would be proper to award them a fee from the fee awarded to class counsel.

## III. KRAMER–DEUTSCH

Counsel for plaintiffs in *Dorfman-Juster,* Mitchell Kramer, Esq. and Herbert Deutsch, Esq., have petitioned this court for an award of $710,000 in attorney fees and $18,617.37 in costs, expenses and disbursements.[19] The facts are set out in the beginning of this opinion and in our previous opinions.[20] We held a hearing on the petition and no objections were raised by the plaintiff class. The settlement agreement provides for a fund of $2 million, which through interest will grow to approximately $2.2 million at the time of distribution.

■ The polestar in considering class counsel's fee requests is *Lindy Brothers Builders, Inc. v. American Radiator & Standard Sanitary Corporation,* 487 F.2d 161 (C.A.3, 1973). The court made clear that the starting point for determining proper attorney fees was the amount to which counsel would be entitled on the basis of a reasonable hourly rate of compensation for the services rendered. Other factors which we must consider in arriving at a final award are:

(a) the contingent nature of the suit, and

(b) the quality of the work performed.

A. Compensation Based on Hours Expended

We are convinced after an independent evaluation of the figures contained in class counsel's affidavit that they are, for the most part, reasonable, commendably detailed and accurate.[21] In valuing the time worked, we shall break down the rate into four categories:

(1) partners,

(2) associates,

(3) para-professionals,

(4) law students.

■ (1) Mitchell Kramer and Herbert Deutsch are experienced attorneys who have been involved in numerous class actions in which they have achieved favorable results for their clients. *See, e. g., In Re Gypsum Cases,* 386 F.Supp. 959, 969–73 (N.D.Cal.1974). Herbert Salus is a former judge of the Court of Common Pleas of Philadelphia County and has been an attorney for twenty-six years. All three of the above normally bill their time at $75 per hour for non-contingent cases. We feel that a figure of $75 per hour is a fair one to use in computing a figure based on compensation for time spent.

■ (2) Most of the associate time was that of Steven Kapustin, of Kramer and Salus. His time is normally billed at $50 per hour, and we consider this reasonable.

■ (3) Class counsel's petition also includes time worked by a para-professional. This is not time which, strictly speaking, involved the provision of legal services or expertise. We cannot agree with the Second Circuit that class counsel may only recover for the out-of-pocket cost of the para-professional rather than a fee based on a reasonable per hour charge.[22] First, we note from class counsel's petition that the practice is to bill para-professional time at a per hour fee. If in class actions only out-of-pocket costs can be recovered, there would be the temptation to use paralegals only for matters which are billed to the client, and use attorneys for all cases involving representation in a class action suit. To

---

**19.** The latter figure is based upon class counsel's first petition and affidavit which claims $16,819.62 in costs and expenses, and their supplemental petition filed June 12, 1975 which claims $1,797.75 in costs and expenses.

**20.** *See* page 368, *supra.*

**21.** The joint petitions and accompanying affidavits are matters of record in this case, and we see no value in reproducing them in detail here.

**22.** *See City of Detroit v. Grinnell Corporation,* 495 F.2d 448, 473 (C.A.2, 1974).

do otherwise would be economically irrational. We believe that a far more desirable result is that para-professionals be employed in class action suits in the same manner and with the same frequency that they are employed in cases where the client is billed directly. While plaintiffs here may have to pay a few more dollars, the overall result will be the more efficient and economical delivery of legal services. We note that other courts in passing upon time worked by legal assistants have awarded a fee based on a reasonable per hour charge. *See In Re Gypsum Cases, supra,* 386 F.Supp. at 972; *Lindy Brothers Builders, Inc. v. American Radiator & Standard Sanitary Co.,* 382 F.Supp. 999, 1009 (E.D. Pa.1974). Thus, in computing a figure based on hours expended, we will use a rate of $20 per hour[23] in valuing para-professional services. *Cf. Lindy Brothers Builders, Inc. v. American Radiator & Standard Sanitary Co., supra,* at 1009. Class counsel's petition states that para-professional time is customarily billed at $20 per hour.

(4) For similar reasons we believe work by a law student should be valued on a reasonable per hour basis. We consider $15 per hour as reasonable compensation for the time of a law student.

Two more points need discussion before computing a figure based on time worked. Class counsel have included in their petition all time spent both in preparing their petition for counsel fees and all time spent opposing the petition of counsel for plaintiffs in *MDL 56.*[24]

■ As to the former, we are reluctantly unable to agree with Judge Harvey in *Lindy* that class counsel are entitled to compensation for their time. 382 F.Supp. 1012–13. Under the "common fund" theory, fee awards are based on the efforts of counsel to establish a fund

which will benefit the class.[25] In *Lindy* the objectors to the fee petition argued that time spent by counsel in preparing and supporting their fee application was "antagonistic to the interests of the class." 382 F.Supp. at 1012. This was so because any resulting fee award would diminish the size of the fund available for distribution to the class. Judge Harvey disagreed with this reasoning, 382 F.Supp. at 1013, stating:

> "Such a rule would encourage the expenditure of minimum time and effort by a petitioning attorney in connection with an important phase of the administration of the fund. The result under such circumstances could very well be an excessive or improperly allocated award, not based on all the relevant circumstances."

We think that class action counsel in seeking an award of counsel fees from the court have an affirmative obligation to themselves and to the court to present a detailed, accurate and comprehensive fee petition. The beneficiaries of the efforts expended on the petition are class counsel themselves. It seems to us that the plaintiff class does not receive any benefit from the preparation and submission of an adequate petition; since class counsel have the duty to submit a sufficient fee petition, a substandard one would not be acceptable as a basis for a fee award.

■ Similarly, we feel we must exclude time spent in opposing the Berger *et al.* fee petition. Class counsel's efforts in connection with that brought no benefit to the plaintiffs, since any award to *MDL 56* counsel would come from class counsel's own fees, not the net fund for distribution to the class. Indeed the only persons benefited were class counsel themselves. Accordingly, we will dis-

---

**23.** We note in passing that since the recent munificent increase in judicial salaries, a district judge who works 40 hours per week for 50 weeks a year is paid at the rate of $21 per hour.

**24.** *See* part II *supra.*

**25.** *See Attorney Fees From Funds,* note 8 *supra.*

count 142 hours of partner time and 46.-25 hours of associate time.[26]

Class counsel's petitions detail a total of 4510.5 hours expended by partners. Subtracting 142 hours yields 4368.5 compensable hours. Similarly, subtracting 46.25 hours from the 270.5 hours of associate time detailed in the petitions results in a figure of 224.25 hours. A total of 552.5 hours by para-professionals and 72.5 hours by law clerks was spent on this case. After multiplying each of these numbers by the appropriate hourly figure, we reach a total of $350,987.50.[27]

We must, however, consider whether other factors require either an increase or a decrease in this amount. We emphasize that while time is our starting point, and a significant factor, it is not the only consideration. As Judge Weinfeld has so aptly pointed out, "To give it prime importance may at times result in rewarding inefficiency or the luxurious practice of law and penalizing those who are efficient and expeditious in performing their legal tasks." *Blank v. Talley Industries,* 390 F.Supp. 1, 5 (S.D.N.Y. 1975).

B. The Contingency Factor

▓ Class counsel accepted this case on a contingent basis; they had no recourse to any client for fees if this action had been unsuccessful. They did not have the benefit of any prior governmental criminal investigation or conviction. It is also true that the case has been vigorously contested by counsel for defendants.

On the other hand, it appears to us that the probability of success on the merits was not as highly speculative as some other cases in which attorney fees have been awarded. Also, there were a number of official investigations into the financial collapse of the Penn Central companies.[28] While these were not as helpful in establishing liability as criminal convictions would have been, they certainly detailed much of the malfeasance and nonfeasance which occurred.

C. The Quality of Work Performed

The attorneys for plaintiffs are experienced and able lawyers. Their special expertise in class actions of this type and their vigor were of significant value in moving the case toward its ultimate disposition, despite the many roadblocks faced. A great many of the factual and legal issues in this case were subtle and complex. For example, our decision to certify this case as a class action required reargument, in large part due to the difficult nature of the determination.[29]

The final settlement figure in this case also appears to be quite favorable to plaintiffs. There was a substantial danger that this action would be consolidated with *MDL 56,*[30] which might well have resulted in a smaller recovery for plaintiffs. As detailed in part I, *supra,* class counsel strongly resisted any consolidation with *MDL 56.*

We have concluded that increasing the hourly figure of $350,987.50 by 50 percent would fairly and adequately take

**26.** We arrived at these figures from an examination of class counsel's original and supplemental petitions. In instances where it was uncertain whether the time was spent on properly compensable activities or on the fee petitions, we used our best estimate in allocating time. Any possible error is of minimal significance. And we see no use in postponing this determination any further since class counsel probably have no better information available. With class action counsel forewarned by our decision today, we do not expect that this problem will arise in the future.

**27.** To avoid any confusion, and to summarize, the following chart giving time and fees explains how we arrived at this figure.

| Class of Work | Hours | Per Hour Fee | Fee |
|---|---|---|---|
| Partner | 4368.5 | $75 | 327,637.50 |
| Associate | 224.25 | $50 | 11,212.50 |
| Para-professional | 552.5 | $20 | 11,050.00 |
| Law Clerk | 72.5 | $15 | 1,087.50 |

**28.** *See, e. g.,* Staff of SEC, Special Subcomm. on Investigations of the House Comm. on Interstate and Foreign Commerce, *The Financial Collapse of the Penn Central Company* (1972). Although the printing date was 1972, the substance of the investigation was revealed in testimony in 1970. *Id.* VII.

**29.** *See Dorfman v. First Boston Corporation,* 62 F.R.D. 466 (E.D.Pa.1973).

**30.** *See In Re Penn Central Securities Litigation,* 322 F.Supp. 1021 (Jud.Pan.Mult.Lit.1971).

into account the contingent nature of this action and the high quality of performance we have observed on the part of counsel. This results in a total fee of $526,481.25. This is 23.9 percent of the total $2.2 million fund recovered for plaintiffs. Such a percentage would constitute a reasonable contingent fee for a case similar to this.

In addition to the fee award, class counsel are entitled to reimbursement of their costs and expenses in the amount of $18,617.37.

Counsel should submit an appropriate form of order.

ORDER

And now, this 6th day of February, 1976, it is ordered that the petition for counsel fees filed by David Berger, P.A.; Blank, Rome, Klaus & Comisky; Farage & Shrager; and Modell, Pincus, Hahn & Reich be and it hereby is dismissed.