George H. ENTIN, on behalf of himself and all others similarly situated

v.

Herbert BARG et al.

Civ. A. No. 71–2920.

United States District Court, E. D. Pennsylvania.

April 7, 1976.

David Berger, P. A., Philadelphia, Pa., Richard D. Greenfield, Bala Cynwyd, Pa., for plaintiff.

George J. Miller, Dechert, Price & Rhoads, Philadelphia, Pa., for individual defendants and Aldon Industries.

Oliver C. Biddle, Ballard Spahr, Andrews & Ingersoll, Philadelphia, Pa., for defendant Arthur Andersen & Co.

## OPINION AND ORDER

EDWARD R. BECKER, District Judge.

### I. *Preliminary Statement*

Approximately two years after we certified a class in this securities fraud action, *Entin v. Barg,* 60 F.R.D. 108 (E.D.Pa.1973), and after extensive discovery and intensive settlement negotiations conducted under our auspices, David Berger, P. A., and Richard D. Greenfield, Esquire, class counsel, and the defendants have entered into a Stipulation of Settlement. We must now determine whether to approve the settlement, a task assigned to us by Fed.R.Civ.P. 23(e). Since we have decided to grant approval, we also must reach the question of the amount of fees and expenses to be awarded to class counsel from the settlement fund, and approve appropriate disbursements from the settlement fund to cover the expenses of the Settlement Committee.

**510**

This controversy arose out of a public offering of 400,000 shares of common stock of Aldon Industries, Inc. ("Aldon"), a manufacturer and distributor of carpets, in February, 1969, at an offering price of $20. On March 27, 1969, plaintiff George Entin ("Entin") purchased 200 shares of Aldon, which was then being traded on the American Stock Exchange, at $22 per share. Entin sold his Aldon stock on July 15, 1969, for $12.75 per share. Aldon stock continued to decline, reaching $3.675 in December 1970.

The defendants are Aldon; Herbert Barg, its board chairman and chief executive officer; Bernard Barg, its president; Alvin Barg, its vice-president; Marilyn and Elaine Barg, trustees of a substantial block of Aldon stock, and Arthur Andersen & Co., the company's auditor.[1]

The gravamen of the complaint is that the registration statement and prospectus issued in connection with the public offering, and certain reports and financial statements released subsequently, showed Aldon's financial condition to be stronger than it actually was because they contained misrepresentations and omissions of material facts in violation of sections 10(b) and 13(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78m(a) and rules 10b–5, 13a–3 and 13a–13 promulgated thereunder.[2] The complaint furthermore asserted that the misrepresentations and omissions were part of a continuing conspiracy and common scheme among all of the defendants to inflate the price of Aldon stock. On the basis of that claim, plaintiff Entin asked the Court to certify a class of all the purchasers of Aldon's stock between February 13, 1969, and February 1, 1970. On June 19, 1973, after hearing, we granted the motion for class action determination, adopting the class definition proposed by the plaintiff.[3] By order dated July 10, 1975, we extended the class period to March 31, 1970, for settlement purposes only.[4]

---

1. The Bargs, as individuals and as trustees, sold 250,000 shares of stock, and Aldon sold 150,000 shares.

2. More specifically, the complaint alleged that defendants: (1) misrepresented the earnings history of Aldon by presenting comparative operating results in a confusing, ambiguous, and misleading manner; (2) failed to disclose the net income per share for each Aldon common share for certain specified periods before the prospectus, which was necessary to a meaningful comparison of the fiscal years and periods presented; (3) failed to disclose that Aldon had accumulated substantial inventories which could be liquidated only at substantial losses; (4) failed to disclose that certain product lines and styles included in Aldon's inventory were subject to changes in consumer preferences and therefore could be liquidated only at substantial losses; (5) misrepresented and failed to adequately disclose Aldon's financial condition, including its inventory and earnings; (6) failed to disclose that, since Aldon factored and assigned substantially all of its receivables, the operating results and net income could be seriously affected by any upward variations in the prime interest rate; (7) failed to disclose that, since Aldon was constructing various extensions to existing physical facilities which would require mortgage financing, operating results would be seriously affected by any upward variations in the interest rates for such mortgage financing; (8) failed to disclose that during the seventy day period prior to the public offering the prime interest rate increased on three occasions, thus affecting all the borrowing with an inevitable concomitant adverse impact on its earnings; (9) failed to disclose that both the federal reserve discount rate and the prime rate increased within sixty days prior to the offering with a serious adverse impact upon Aldon's earnings prospects; (10) failed to disclose that Aldon planned an extensive and costly advertising campaign which would have a serious adverse impact on earnings; (11) failed to disclose in the registration statement and prospectus the operating results for the nine fiscal months ending November 3, 1968; (12) failed to disclose that the Board of Directors' approval of a change in the company's fiscal year effective some seven weeks prior to the public offering would have a substantial material and misleading effect on the comparative operating results reported in the registration statement and prospectus; and (13) failed to disclose that substantial amounts of plant and equipment were either physically or economically obsolete at the time of the public offering.

3. The motion for class action determination was contested by the defendants, who also sought certification to the Court of Appeals under 28 U.S.C. § 1292(b) to appeal the order certifying the class. After a hearing in chambers, we denied the petition for certification.

4. The rationale for the extension was that a March 20, 1970, press release by Aldon disclosed many material facts regarding its financial condition which tended to cure the alleged violation. We chose March 31, 1970, as the date after which decisions by investors to purchase Aldon stock would no longer be based on the allegedly misleading materials.

Plaintiff asserts that the total damage suffered by class members was a maximum of $6,530,000. Plaintiff arrives at this figure by taking December 31, 1970, the date on which the price of Aldon stock reached a low point of $3.675 as the cut off point for damages, thus calculating that each share of stock offered at $20 in the public offering suffered a market decline of $16.325 by December 31, 1970. The $6,530,000 is the product of $16.325 (the amount of decline) and 400,000 (the number of shares sold in offering). This figure is merely an outside "guesstimate" of the damages suffered, however, since some class members, including Entin, purchased their stock at a price in excess of $20, and some sold their stock after March 31, 1970 (so that the new purchaser does not qualify as a class member) but before the price dipped to $3.675. We shall, however, use this liberal "guesstimated" figure in weighing potential class recovery against the proposed settlement amount.

The Stipulation of Settlement, which was entered into on July 8, 1973, provides that the defendants shall pay to the class a total of $1.1 million, the settlement figure we recommended.[5] The defendants have paid that amount into an escrow fund, which has been earning interest since January 14, 1975. Excluding interest, the gross settlement amount is 17% of the approximated damage figure.

The Stipulation of Settlement provides that after plaintiff's counsel fees and litigation costs, and the costs of administration of the settlement, including the costs of sending notice of the settlement offer to class members, are deducted from the fund, the remainder shall be distributed to the class members who have filed claims, according to their provable loss. The provable loss of class members shall be measured in two ways. For those members who sold their Aldon stock by December 31, 1970, their provable loss is to be measured by the difference between their purchase and sale prices. For those class members who did not sell their stock by December 31, 1970, their provable loss is to be the difference between their purchase price and the closing price of Aldon stock on the American Stock Exchange on December 21, 1970 ($3.675).[6]

No class member filed objections to the settlement and none appeared at the hearing held, pursuant to notice, on November 15, 1975, to consider the settlement approval and counsel fees. One class member filed an objection to an award of a counsel's fee in excess of 33% of the settlement amount, unless the value of counsel's time was in excess of 20% of the settlement amount, though he did not appear at the hearing. The hearing was held as scheduled on November 15, and we received evidence in support of settlement approval and counsel fees. Because a number of class members had received late notice of the settlement proposal,[7] we ordered additional notice and scheduled a second hearing approximately six weeks later to give these class members an opportunity to object. However, no objections were filed by the late notice recipients, and on the date scheduled, no class members appeared to object; hence, the second hearing was not formally held.

## II. *Notification Program*

In accordance with the mandate of Fed. R.Civ.P. 23(c)(2) and the Supreme Court in

---

5. The breakdown of the payments are as follows:

    (a) The Underwriters at Lloyd's and those British Companies subscribing to Policy No. CX/0814 which insures Aldon and all of the individual Barg defendants have paid $1,-000,000;

    (b) Anderson has paid $50,000; and

    (c) Herbert, Bernard, Alvin, Marilyn and Elaine Barg and Aldon have paid $50,000.

6. The Stipulation of Settlement also states that if members of the class holding legal or beneficial title to more than 85,000 shares of Aldon stock request to be excluded from the class within 90 days after notice has been mailed to the class, all defendants, except Arthur Andersen, may withdraw from the settlement. After an extensive notice program (which is described in detail in Part II *infra*) only 18 members of the class holding title to 1825 shares opted out, so that this provision was not triggered.

7. *See* Part II *infra*.

*Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 173, 94 S.Ct. 2140, 2150, 40 L.Ed.2d 732, 746 (1974), that class members should receive "the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort," Rule 23(c)(2), we ordered an extensive program of individual mailings and newspaper publications. This was a function not only of customary practice but also of our knowledge that a not inconsiderable number of Aldon shares had been held by brokerage houses in "street names" and that in the intervening years a large number of brokerage houses had failed. After the Court of Appeals in *Girsh v. Jepson,* 521 F.2d 153 (3d Cir. 1975), reemphasized the importance of adequate notice, we reviewed the results of the initial individual mailings and publication program and ordered that a finding service be engaged to find current addresses for potential class members whose initial notices were returned by the Postal Service as undeliverable.

■ The original mailing list of approximately 3,469 potential class members was compiled by using 1970 and 1971 year-end shareholder lists (with addresses updated, where possible, from the 1974 year-end shareholder list), supplemented by the actual transfer records of both transfer agents for Aldon stock from the time of the public offering through one month beyond the class period. The settlement committee, on or about July 18, 1975, sent notice and proof of claim forms to the 3,469 potential class members on the list. Where the record owner was a brokerage firm which appeared not to be the beneficial owner of the stock, an additional form of notice was included, directing the recipient (1) to mail copies of the notice and proof of claim

forms to the beneficial owners; (2) to certify to the Court that the required mailing was done; and (3) to report to the Court the names and current addresses of the beneficial owners. The post office returned 598 of the notices as undeliverable. The Shareholder Communications Corporation was then engaged to attempt to correct the addresses of those potential class members whose notices were returned by the post office. Shareholder Communications provided corrected addresses for 424 or 71% of these 598 potential class members.[8] A second, later mailing was made to these persons.

In addition, a long form of notice containing, among other information, the history of the litigation, instructions on how to file a claim, and the time and place of the original hearing, was published once a week for two successive weeks in the national and regional editions of the Wall Street Journal and once in both the Philadelphia Inquirer and Philadelphia Bulletin. A short form of notice, which gave *inter alia,* the time and place of the hearing and the address to write for further information, was published twice in the New York Times, Chicago Tribune, Los Angeles Times and Atlanta Journal, and once in both the Philadelphia Inquirer and Philadelphia Bulletin. As a result of the two mailings and the publication program, a total of 1,512 valid claims, representing 319,333 shares and claiming damages of $3,410,863.23, have been filed. The gross settlement amount is thus one third of the amount of claimed damages.

We find this three stage notification program to constitute the "best notice practicable under the circumstances," and that the Rule 23 requirements were thus satisfied.

---

8. Attached to the affidavit of Alexander B. Miller, president of Shareholder Communications Corporation, which was filed with the Court, was a copy of a letter from Mr. Miller to Mr. Edward J. McIntyre, Esquire, one of defendants' counsel, in which Mr. Miller explained the steps that had been taken to correct the 598 addresses, which include the use of telephone and city directories in the area of the individual's last known address to locate either the individual, or his relatives or former neighbors who might know his present address, and the use of Freedom of Information Act requests to Postmasters for forwarding addresses.

III. *The Merits of the Settlement Offer*

A. *Standards to be Used in Determining Whether to Approve the Settlement*

■ In evaluating the adequacy of a proposed settlement, we must apply a balancing test, weighing the likelihood of success and the amount of the potential recovery if the case continued against the amount offered in the settlement. See *Bryan v. Pittsburgh Plate Glass Co.*, 494 F.2d 799, 801 (3d Cir. 1974); *State of W. Va. v. Charles Pfizer & Co.*, 314 F.Supp. 710, 740–41 (S.D.N.Y.1970), aff'd, 440 F.2d 1079, 1085 (2d Cir. 1971); cf. *Protective Committee v. Anderson*, 390 U.S. 414, 424, 88 S.Ct. 1157, 1163, 20 L.Ed.2d 1, 9 (1968). The Court of Appeals in *Girsh* noted with approval a list of some of the factors to be considered which had originally been enumerated by the Second Circuit in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974). They are as follows:

> (1) the complexity, expense and likely duration of the litigation . . .; (2) the reaction of the class to the settlement . . .; (3) the stage of the proceedings and the amount of discovery completed . . .; (4) the risks of establishing liability . . .; (5) the risks of establishing damages . . .; (6) the risks of maintaining the class action through the trial . . .; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery . . .; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation . . .

*Girsh*, 521 F.2d at 157; *Grinnell*, 495 F.2d at 463.

Other general principles in this area are that the judge must not turn review of the settlement into a hearing on the merits. See *Newman v. Stein*, 464 F.2d 689, 691–92 (2d Cir. 1972). The Court need not "balance the scales with the nicety of an apothecary,." *Glicken v. Bradford*, 35 F.R.D. 144, 152 (S.D.N.Y.1964), or "substitute its business judgment for that of the parties; . . . ." but rather must only determine whether the settlement falls within the reasonable range of fairness to the class. See *Newman*, 464 F.2d at 693 (2d Cir. 1972). Finally, the view of experienced counsel as to the merits of the settlement is "entitled to considerable weight." See *State of W. Va. v. Charles Pfizer & Co.*, 314 F.Supp. at 743.

With these basic principles in mind, we turn to the case and the settlement proposal now before us.

B. *Application of the Basic Principles*

1. Risks Involved in Establishment of Liability

■ To establish liability in a 10b–5 action, plaintiff must not only show misrepresentations and omissions, but also that the misrepresentations and omissions were material. The test of materiality is whether "a reasonable investor might have considered them [misrepresentations and omissions material] in the making of [the investment] decision." *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741, 761 (1972).

To establish a claim, plaintiff, of course, must first establish that there actually were misrepresentations and omissions. In this case, several of plaintiff's claims deal with the manner in which Aldon presented certain financial data in its prospectus, including a certain change in the fiscal year. The papers filed by defendants, particularly by the auditors, reflect a sharp dispute on this point, and we perceive that plaintiffs might have serious difficulty in establishing misrepresentation in this area.

Another group of plaintiff's allegations deal with the failure to reveal that the prime interest rate had increased within the sixty day period prior to the offering, which would have an adverse impact on Aldon's earnings prospects. The prime interest rate is public information, which is readily available to investors in newspapers and from other sources, and its short term effect on

earnings of highly leveraged companies is common knowledge. Thus, there might be a question as to whether the prime interest rate and its economic effect are facts that must be repeated in every prospectus and registration statement, or fall into the area of commonly known facts and information about the world which an issuer of securities may properly assume are known by investors and which need not be repeated in each prospectus and registration statement that is written. Thus, these omissions might not have provided a firm basis for liability either.

Another set of plaintiff's allegations relate to putative changes in consumer preferences, the disclosure of which might be argued to be of doubtful value. While most of plaintiff's claims, including his major claims, relating to alleged nondisclosure or misleading disclosure of financial data, the inventory accumulation, proposed construction and existing plant obsolescence are subject to problems of proof rather than of legal sufficiency, it is our view, from our review of the documents and our many conferences in the case, that any trial would have been extremely lengthy and with an uncertain outcome.

To establish the liability of defendant Arthur Andersen & Co., plaintiff would have to have shown scienter. See *Ernst & Ernst v. Hochfelder*, —— U.S. ——, 96 S.Ct. 1375, 47 L.Ed.2d 668, 44 U.S.L.W. 4451 (1976). Plaintiff therefore would have faced the difficult task of proving that a large accounting firm acted wilfully. Additionally, plaintiff might have had to convincingly present to the finder of fact complex and technical questions of accounting principles and procedure in order to prove Arthur Andersen's wrongdoing. The risks inherent in litigating each and every one of these questions are obvious.

Finally, in order to prove the allegation that the individual defendants and Arthur Andersen conspired to perform the allegedly violative acts, plaintiff would have to show that each alleged conspirator partici-

pated in the violative act or either entered into agreement with or gave assistance to the primary wrongdoers.[9] Particularly in the cases of Marilyn and Elaine Barg and Arthur Andersen, there is a significant risk that plaintiff would have been unable to establish the requisite degree of participation.

Given these risks alone, we would find a recovery of 17% of the amount of the "guesstimated" alleged damage (and probably a much higher percentage of the true figure if it could be known) and about one third of the amount of the damages suffered by claim-filing class members to be within the range of reasonableness. The risks involved in proving causation, to which we now turn, serve to reinforce this view.

### 2. Risks Involved in Proving Causation and Damages

■ Even if liability were shown at trial, defendants would have argued that the "actual damages [suffered] on account of the act complained of," Securities Exchange Act of 1934, § 28(a), 15 U.S.C. § 78bb(a), is the amount by which the price of Aldon stock was inflated due to the alleged misrepresentations and omissions, not the entire decline in price, since the securities issuer who violates the antifraud provisions of the securities laws does not hold his victim-purchaser harmless against losses due to general market declines. *See* Securities Act of 1933, § 15 U.S.C. § 77k(e); *Bleznak v. C.G.S. Scientific Corp.*, D.C., 61 F.R.D. 493 (E.D.Pa., 1974); *cf. Globus v. Law Research Service, Inc.*, 418 F.2d 1276 (2d Cir. 1969), *cert. denied*, 397 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93 (1970); *Feit v. Leasco Data Processing Equipment Corp.*, 332 F.Supp. 544, 586 (E.D.N.Y.1971); *Fox v. Glickman*, 253 F.Supp. 1005, 1010 (S.D.N.Y. 1966). Using this measure of damages, one of the defendants argued at one point during settlement negotiations that the proper measure of recovery, if liability were shown, would be the amount of decline in

---

**9.** *See* Ruder, *Multiple Defendants in Securities Law Fraud Cases: Aiding and Abetting, Conspiracy, In Pari Delicto, Indemnification & Contribution.* 120 U.Pa.L.Rev. 597, 646 (1972).

market price following immediately after the March 1970 press release, or $.375 per share. According to this theory, the total class recovery would be limited to $150,000 ($.375 x 400,000 shares). Although we intimate no view respecting this theory,[10] it does serve to highlight the risks which plaintiff would have faced at trial on the questions of causation and proof of damages. The risk is certainly substantial that the full recovery at trial would have only been a fraction of our $6,530,000 base figure.

Further evidence that plaintiff would have had difficulty establishing causation is the fact that there was a general decline of similar magnitude in the prices of other carpet industry stocks during the relevant period,[11] suggesting that general market conditions were responsible for the decline in Aldon stock. The possibility that recovery could be limited to as little as $150,000, even if liability were shown, makes the $1.1 million settlement amount look even more reasonable.

### 3. Conclusion

Reviewing the factors enumerated in *City of Detroit v. Grinnell Corp., supra*, approved in *Girsh*, we have found that the preponderance thereof strongly militate in favor of approval of this settlement: the complexity, expense, and likely duration of the litigation; the reaction of the class to the settlement (no class members have objected); the risks of establishing liability; the risks of establishing damages; and the

range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation. Still another criterion, that set forth in *State of W. Va. v. Charles Pfizer & Co., supra*, is met, for we note that eminent class counsel has recommended the settlement, thus constituting an independent factor supporting a finding of reasonableness. Accordingly, we find the settlement to be reasonable, and we approve it.

### IV. Approval of Disbursements for Plaintiff's Counsel Fee and Litigation Expenses, and the Costs of the Settlement Committee

David Berger, P. A., and Richard D. Greenfield, Esquire, have jointly petitioned the Court for a total counsel fee of $360,000. The Stipulation of Settlement provides that plaintiff's litigation expenses shall also be paid out of the settlement fund. David Berger, P. A., has also petitioned the Court for reimbursement of $37,609.25 in expenses, and Richard D. Greenfield has petitioned for reimbursement of $1,936.89. Additionally, the Court has before it a petition of the Settlement Committee for reimbursement of costs of $45,209.06.[12] The Committee has also petitioned for allowance of the fees of the disbursing agent, the precise amount of which will not be known until the time of distribution.[13] After a hearing at which no objections were raised,[14] we award class

---

**10.** Class counsel stated at the November 15, 1975, hearing that they intended to argue that a "but for" test applies, and that therefore defendant is liable for the entire loss suffered.

**11.** The stock values of comparable carpet companies declined as follows during this period:

| COMPANY | AT TIME OF ALDON ISSUE (February 1969) | LATE MARCH 1970 | PERCENT- AGE DECLINE |
|---------|------------------|--------|---------|
| Barwick | 23½ | 11¼ | 57% |
| Columbus | 21¾ | 6⅝ | 70% |
| Masland | 24⅛ | 9½ | 61% |
| Ozite | 41 | 18⅞ | 54% |
| Sequoyah | 25¾ | 5½ | 78% |
| Aldon | 20 | 6 | 70% |

**12.** David Berger, P. A., has additionally included in its fee petition 98.50 hours spent on settlement administration. We shall compensate them separately for this time.

**13.** The costs of the disbursing agent are an administration fee of $1,500.00, a disbursement fee of $1.50 per class member, and the out of pocket costs of printing, postage, etc.

**14.** As noted above, there was one objection to a fee in excess of 33%, unless the value of the time spent by class counsel was in excess of 20% of the recovery. We note that the fee is not in excess of 33%.

counsel a fee of $258,447.38, plus $4,240.00 to cover time spent on settlement administration. The petitions for litigation expenses are approved in full. The Settlement Committee shall also be reimbursed in full,[15] including the costs of the disbursing agent.

The standard for determining the amount of the fee to be awarded to plaintiff's counsel in a class action settlement is set forth in *Lindy Brother Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161 (3d Cir. 1973). The Court there specified four factors to be considered in determining the fee:

1. the number of hours spent in specific categories of legal work by individual attorneys;
2. the reasonable hourly rate for the time spent by each particular attorney when engaged in the various activities;
3. the contingent nature of success in the suit; and
4. the quality of the work performed by the attorneys.

The Court later stated in *Merola v. Atlantic Richfield Co.*, 515 F.2d 165 (3d Cir. 1975),

that, in settled cases, the last factor "is reflected largely in the benefit produced." 515 F.2d at 168. Courts applying the *Lindy* standards have proceeded by multiplying the first two factors together to arrive at a base compensation figure and then deciding, based on the third and fourth factors, whether the base figure should be adjusted to make the final fee figure reasonable. We shall proceed by applying this formula.

A. *Computation of Base Compensation Figure*

Class counsel have provided us, in their fee petition, with a detailed compilation of the time spent by them in specific categories of legal work. Although *Lindy* makes clear that the matter of the amount of time spent is a question of fact to be independently determined by the Court (and we note that some courts have found it necessary to adjust downward figures provided by counsel, see *Blank v. Talley Industries, Inc.*, 390 F.Supp. 1, 4 (S.D.N.Y.1975)), we believe that the figures provided by counsel accurately reflect the amount of time spent, and we shall use those figures in our calculations.[16]

---

**15.** The Stipulation of Settlement authorized the Settlement Committee to make certain disbursement without prior court approval. The Committee made payments of $13,655 to the accounting firm that reviewed the proofs of claim and $4,245 to the Shareholder Communication Corp. in this manner. The Committee now seeks to be reimbursed $28,449.25 for the cost of notice and miscellaneous costs of administration of $16,759.81, about half of which is the cost of time spent by defendants' counsel in administering the settlement. We have reviewed the rates of counsel and paralegals involved in this aspect of the matter. We conclude that they are reasonable and award reimbursement as requested to the Settlement Committee.

**16.** A summary of the figures are as follows:

| Attorney | Hours Spent |
| --- | --- |
| David Berger | 40.75 |
| H. Laddie Montague | 3.75 |
| Harold Berger | 1.00 |
| Leonard Barrack | 1292.25 |
| Richard Greenfield | 701.25 |
| Gerald Rodos | 75.50 |
| Edward Rubenstone | 10.00 |
| Sherrie Raiken Savett | 94.25 |
| Law Clerks | 252.25 |
| Paralegals | 946.75 |

The bulk of the hours were consumed in reviewing the voluminous documents and financial data produced by defendants pursuant to plaintiff's requests, in analyzing this data, and in extensive depositions.

Class counsel have also petitioned for payment for the value of the time they spent in preparing their fee petition and attending the part of the November 15, 1975 hearing at which the fee petition was argued. Using the reasonable hourly rates for counsel's time that we have arrived at, see note 17, infra, the value of this time is $3,492.50. Although we find that this time indirectly benefits the class and is, therefore, compensable, see *The Stanford Daily v. Zurcher*, 64 F.R.D. 680, 683–84 (N.D. Cal.1974), we find this amount to be excessive. We shall award class counsel $1,500.00 as compensation for this time. Because the risks inherent in undertaking the litigation which are referred to in *Lindy* are not present in that fee petition proceeding, we shall not apply the multiple to this payment.

The time spent by class counsel on settlement administration, although properly chargeable against the settlement fund, is treated as part of the cost of settlement administration. As with the fee petition work, settlement administration is not subject to the risks inherent in undertaking the litigation, and therefore we shall not apply the multiple to this sum.

In determining the reasonable hourly rates for the attorneys involved, the *Lindy* Court stated:

> The value of an attorney's time generally is reflected in his normal billing rate. A logical beginning in valuing an attorney's services is to fix a reasonable hourly rate for his time—taking account of the attorney's legal reputation and status (partner, associate).

487 F.2d at 167.

■ Class counsel have attempted to provide us with their "normal billing rates." However, at the hearing held on the fee petition, it appeared that class counsel do not have normal billing rates in the conventional sense, because the vast bulk of their legal work is in the nature of class action securities and antitrust matters which is performed on a contingency basis. We thus determine based upon our own knowledge of the going rate for legal services in the Philadelphia area,[17] reasonable hourly rates for attorneys with the experience and professional status of those who provided services to the class.[18] Substantial work on this case was also done by paralegals and part-time law clerks. · We agree with Chief Judge Lord that the value of paralegal time should be based on the rate at which their time is normally billed so that there will be

no "temptation to use paralegals only for matters which are billed to the client, and use attorneys for all cases involving representation in a class action suit." *Dorfman v. First Boston Corporation*, 70 F.R.D. 366 (E.D.Pa., filed Feb. 6, 1976). Similarly, we believe that the time of law clerks should be valued at their normal hourly rate.[19]

Given these decisions regarding rates and hours spent, we calculate the base compensation figure to be $165,772.50.

### B. Adjustments for the Contingency of Success and Quality of Work Factors

The Third Circuit in *Lindy* stated that the district court, in determining the contingency of success, "should consider any information that may help to establish the probability of success." The Court also noted that the outcome of a prior government investigation · is an appropriate indicia of the likelihood of success. In this case, no government investigation took place.

We believe that our discussion in connection with the approval of the settlement of the problems facing plaintiff in this litigation sufficiently highlights the reasons why we find that class counsel exposed themselves to considerable risks in undertaking it, while at the same time committing a

---

17. See *Lindy*, 487 F.2d at 169. "A judge is presumed knowledgeable as to the fees charged by attorneys . . . ."

18. We find the reasonable hourly rates to be as follows:

| Attorney | Hourly Rate |
|---|---|
| David Berger | $125 |
| Harold Berger | $100 |
| H. Laddie Montague | $90 |
| Leonard Barrack | $65 |
| Richard Greenfield | $65 |
| Gerald Rodos | $50 |
| Edward Rubenstone | $40 |
| Sherrie Raiken Savett | $40 |

David Berger, a practitioner for almost 40 years, is widely regarded as one of the nation's foremost plaintiff's class action attorneys in both the securities and antitrust fields. He is a former City Solicitor of Philadelphia and a former Chancellor of the Philadelphia Bar Association.

Harold Berger is a former judge of the Philadelphia Common Pleas Court, who has been practicing for approximately 25 years.

. H. Laddie Montague, Jr., has been practicing for 13 years and is a member of the executive committee of David Berger, P. A.

Leonard Barrack, who has been practicing for about eight years, is chairman of the securities department of David Berger, P. A., and a member of the firm's executive committee. Mr. Barrack, along with Mr. Greenfield, shouldered the major portion of the load in this litigation.

Gerald Rodos has been practicing for almost six years. Edward Rubenstone has been practicing for almost four years and Sherrie Raiken Savett for almost three years.

Richard D. Greenfield, who is co-counsel to David Berger, P. A., in this suit, has been practicing for about eight years and has extensive experience in securities class action litigation.

19. We find the normal hourly billing rate for paralegals to be $20 and for summer law clerks to be $15.

staggering amount of lawyer hours, overhead and expense to its prosecution. Additionally, the fact that defendants were represented by able and experienced trial counsel from some of Philadelphia's best law firms increases the risk of an unfavorable outcome.

■ Based on our observations of the work of class counsel at hearings, conferences and settlement negotiations, and our review of their factual development and legal work, we believe that their work has been of a high caliber. We also find the settlement which they have achieved is an excellent one and that the benefit produced for claiming class members, which will amount to about one fourth of their claimed losses, given all of the circumstances, particularly the risk involved, is highly favorable. See *Merola, Dorfman; cf. Bowman v. Combustion Engineering, Inc.*, C.A. No. 74–1236 (E.D.Pa., filed Feb. 26, 1976). Given the foregoing, we have decided that by increasing the base compensation figure by 55%, we will fairly and reasonably compensate class counsel for their work. In *Dorfman* and *Blank*, both of which were also securities actions, the Courts incremented the base compensation figure by a similar percentage.[20] We rely especially upon *Blank*, because the task facing class counsel there was similar to that faced at bar. The fee which we will award is therefore $256,-947.38 plus $1,500.00 for work performed on the fee petition or a total of $258,447.38. This fee is 23.5% of the gross settlement amount, which would be a reasonable contingency fee for a case of this sort. See *Dorfman.*

Class counsel and the Settlement Committee shall also be reimbursed the amounts referred to above for expenses and time spent on settlement administration. Accordingly, we enter the following order approving the settlement and disbursements for fees and expenses.

---

20. The increment in *Dorfman* and *Blank* was 50%.