**COMMONWEALTH OF PENNSYLVANIA et al., Plaintiffs,**

v.

**Joseph F. O'NEILL et al., Defendants.**

**Civ. A. No. 70–3500.**

United States District Court,
E. D. Pennsylvania.

April 28, 1977.

As Amended April 28, 1977.

Robert P. Vogel, Dept. of Justice, Robert Reinstein, Henry W. Sawyer, III, Alan F. Klein, Philadelphia, Pa., for plaintiffs.

James M. Penny, Jr., Philadelphia, Pa., for defendants.

## MEMORANDUM AND ORDER

FULLAM, District Judge.

Plaintiffs have petitioned for an award of counsel fees and expenses in this long and complex litigation challenging the hiring and promotional practices of the Police Department of the city of Philadelphia on racial grounds. The action was filed in 1970. Plaintiffs sought preliminary injunctive relief against the use of the existing entrance examinations, background investigation processes and promotional examinations. After extensive preliminary proceed-

ings, I concluded that significant disparate impact upon racial minorities had been shown in each category; since no attempt had been made to justify the discriminatory impact through validation of the testing procedures, I concluded that they could not form a basis for constitutionally permissible personnel decisions which would perpetuate the discriminatory consequences. A preliminary injunction was therefore entered, the effect of which was to require the City, if it wished to hire additional police officers, to eliminate the disparate impact of the tests by hiring at least one minority applicant for every two Caucasian applicants, that being roughly the proportionate distribution in the pool of applicants. *Commonwealth of Pa. v. O'Neill,* 348 F.Supp. 1084 (E.D.Pa. 1972). A similar injunction was entered with respect to promotions. On appeal, after *en banc* consideration, the injunctive order was affirmed by an evenly divided court, insofar as it related to hiring. *Commonwealth of Pa. v. O'Neill,* 473 F.2d 1029 (3d Cir. 1973).

In April of 1973, the parties agreed to the entry of a Consent Decree in this Court. Under the terms of the Decree, the defendants were to retain a reputable testing organization to prepare, and validate as job-related, an entirely new entrance examination and to assist in the preparation of criteria and procedures for evaluating the backgrounds of applicants so that such screening would be constitutionally and legally valid. Minority applicants who had previously, during an agreed-upon period, been rejected were to be notified of their right to be retested or rescreened; if found eligible under the new procedures, they would be given first priority in hiring, and would be awarded back pay to the date when they should have been hired initially. During the interim period until the new background investigation procedures were adopted, the rescreening would consist of review by a special panel, including one outside neutral expert.

## I.  FEES

The fee applications now before the Court cover the period from the filing of the lawsuit until March 26, 1976, and embrace services rendered in the litigation leading up to the entry and subsequent implementation of the April 1973 Consent Decree. (Litigation concerning the racial impact and validity of the new entrance examinations, the new promotional examinations, and the new background investigation procedures has just been concluded; briefs have not yet been filed.)

The applications now before the Court represent a composite of various petitions which have been filed from time to time seeking interim awards of counsel fees and costs. It is appropriate at the outset to note the circumstances which made it exceedingly difficult to deal appropriately with these applications as they were filed.

This action was originally filed under the Civil Rights Act, 42 U.S.C. § 1981. Title VII was made applicable to municipalities in 1972. Thereafter, all concerned treated the issues in light of the Title VII standards and the EEOC guidelines, but the Complaint was not formally amended to allege Title VII violations (and compliance with administrative right to sue requirements) until 1976. Until the decision of the Supreme Court in *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), all concerned were proceeding on the assumption that counsel fees could be awarded under § 1981.

But in view of the *Alyeska* decision, the counsel fees issues became unexpectedly complicated. If the Complaint were deemed amended retroactively (as it eventually was), counsel fees could presumably be awarded for the period from 1972 on, under Title VII. Irrespective of Title VII, counsel fees could presumably be awarded, to some extent, under one or more of the following possible theories: as sanctions under the discovery rules, to the extent that the services were rendered in compelling discovery; as penalties in connection with various contempt proceedings which have dotted the history of this litigation; and/or to the extent that the defendants' conduct of this litigation might properly be charac-

terized as conducted in bad faith or with conscious racial animus. Fortunately, while the Court was wrestling with these problems and attempting to determine whether allocation of the fee claims on some such basis would be possible on the existing record, Congress, in October of 1976, enacted the Civil Rights Attorneys' Fees Awards Act, which adds to 42 U.S.C. § 1988 the following language:

". . . In any action or proceeding to enforce a provision of sections 1981 to 1983, 1985, and 1986 of this title, . . the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs."

42 U.S.C.A. § 1988 (Pamphlet No. 4, Part 3, 1976), *amending* 42 U.S.C.A. § 1988 (1970).

█ The legislative history leaves no doubt as to the applicability of the first provision to pending cases,[1] and I therefore conclude that the Court now undoubtedly has discretionary authority to award counsel fees in this case. At least to the extent of the Consent Decree, plaintiffs are clearly the prevailing party; the issue therefore is whether, and to what extent, attorney's fees should properly be awarded in this case. While consideration of the nature of the particular services, and of the relative good faith or recalcitrance of the parties, still bear upon the exercise of discretion, precise categorization is no longer necessary. *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitation Corp.,* 540 F.2d 102 (3d Cir. 1976) (*Lindy II*); *id.,* 487 F.2d 161 (3d Cir. 1973) (*Lindy I*).

Plaintiffs received legal assistance from three separate sources: Robert J. Reinstein, acting to some degree in his capacity as consultant to the Office of the General Counsel of the NAACP; various members of the Philadelphia law firm of Drinker Biddle & Reath (Drinker), but primarily Henry W. Sawyer, III, Alan Klein and Amy Davis; and Robert P. Vogel, Assistant Attorney General with the Community Advocate Unit of the Pennsylvania Department of Justice. As will be discussed later in more detail, these attorneys divided and distributed the workload among themselves so as to avoid duplication and expedite the disposition of the case.

The documentation of the hours expended by these attorneys in the prosecution of this case has been exceptionally thorough, detailed and accurate. Fortunately, there has been no need to "reconstruct" the number of hours or the manner in which they were spent, for throughout the course of this litigation each attorney has kept contemporaneous time records specifying actual hours expended and the area of the case to which the time was devoted.[2] It is for this and other reasons that no evidentiary hearing was conducted on the propriety of awarding fees to plaintiff's counsel.

█ Unlike *Lindy I,* which held that an evidentiary hearing is required "where the facts to be weighed in light of the judge's expertise are disputed," 487 F.2d at 169, the special tensions inherent in awarding fees under the "equitable fund" theory are absent,[3] *id.;* the record before me is thoroughly documented and supported by time records and affidavits, *cf.* 540 F.2d at 120; each side has briefed and re-briefed the issues; and defendants do not dispute either the number of hours claimed to have been worked, or the requested hourly rates.[4]

---

1. *Accord, Wade v. Mississippi Cooperative Extension Serv.,* 424 F.Supp. 1242 (N.D.Miss. 1976).

2. The importance of accurate timekeeping has been emphasized by the Court of Appeals for the Third Circuit. *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.,* 540 F.2d 102, 109 (3d Cir. 1976) (*Lindy II*).

3. *Lindy I* was a class action where plaintiffs sought treble damages for defendants' antitrust violations. *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitation Corp.,* 487 F.2d 161 (3d Cir. 1973) (*Lindy I*). The petitions for fees by plaintiffs' attorneys in that case raised the touchy question of whether, and in what amount, the unrepresented class members would be required to contribute from their recovery to the award of attorneys' fees. *See* 540 F.2d at 118–20.

4. Instead, defendants merely make general claims that there was unnecessary duplication, and ask the Court to make an independent determination of whether the time spent was

It is pertinent, too, that at no time during the lengthy period over which the fees petitions were pending did defendants' counsel ever seek a hearing, even when plaintiffs' counsel requested, by letter to the Court dated June 16, 1976, that the fees decision be made on the present record absent a request for a hearing by defendants or a determination by the Court that one was necessary.[5] The award of fees will, therefore, be made on the basis of the present record.

### Robert J. Reinstein

By an oral Order of this Court in 1973, Mr. Reinstein was excused from filing a formal petition for counsel fees. Although a petition had been prepared on his behalf, he was in Europe at the time the petition was to be filed with the Court, and was unable to sign it.[6] He had, however, signed and filed an affidavit in support of his request for fees before he left the country, and I accepted the affidavit in place of a formal petition. This affidavit speaks for the first period of time for which fees are sought, from December 4, 1970, through May 22, 1973. Mr. Reinstein also seeks fees for work he performed between May 23, 1973, and March 26, 1976; that request is formally documented in petitions filed jointly with Drinker Biddle & Reath.

It was through Mr. Reinstein's diligence that this suit was brought to fruition.[7] He was responsible primarily for developing plaintiffs' and refuting defendants' expert

reasonably necessary to the prosecution of the case. Defendants' Memorandum of Law in Opposition to Counsels [sic] for Plaintiffs' Petitions for Attorneys' Fees. That, of course, is not an objection but simply an exhortation that the Court do what is its duty under Lindy I and II. No benefit could accrue from airing this claim in a hearing; the Court not only has each attorney's time records, but also a summary of the areas of the case in which each attorney was involved. See "Summary of Time Charges" in both the Appendix to the Joint Supplemental Memorandum of Law of Drinker Biddle & Reath (Drinker) and Robert J. Reinstein in Support of Their Petitions for Attorneys' Fees, and Plaintiffs' Memorandum of Additional Authorities and Updated Time Charges and Expenses in Support of Their Petitions for Attorneys' Fees [hereinafter referred to as "Joint Supplemental Memo" and "Memo of Updated Time Charges."].

The defendants lodge another "objection," albeit in a roundabout way; they ask the Court to compare the total fees requested with the salaries received by defendants' counsel, as if to say that the admittedly large discrepancy alone reveals the excessiveness of plaintiffs' fee requests. The suggested analysis, however, is not only inconsistent with the standards enunciated in Lindy I and II, it is also mathematically unsound.

Assuming plaintiffs' attorneys from the Drinker firm were granted fees in the full amount requested, $113,095.17, and dividing that amount by the number of years over which their services have been rendered (six), the annual fees earned would be $18,849.20. Assuming that this amount still exceeds the defendants' attorneys' annual salaries, it must be remembered that the figure represents the work of not one, but six attorneys. Further calculations are unnecessary to illustrate that the proposed analysis does not withstand scrutiny.

5. Defendants' counsel, of course, received a copy of that letter and thus were on notice of plaintiffs' counsel's request.

6. Only one minor difficulty resulted from this arrangement. The few objections which the defendants framed to Reinstein's request for fees were filed as an "Answer to Petition for Counsel Fees (Robert J. Reinstein)." That Answer admits or denies the allegations of the formal petition (a copy of which must have been served upon the defendants), by numbered paragraphs apparently corresponding to those of the formal petition. While the Court was somewhat handicapped in assessing the cross-arguments because it did not have a copy of the formal petition, the Court gave due consideration to the City's positions as expressed in its Answer by construing them against the averments in Mr. Reinstein's affidavit.

7. His affidavit reveals that he expended a considerable amount of time trying to secure the involvement in this litigation of one of several large Philadelphia law firms that would have the resources to deal with the complexity of the case. Although many were convinced of the merits of the case, they hesitated to incur the adverse political ramifications that could ensue from undertaking its prosecution. He finally succeeded in securing a commitment from Drinker Biddle & Reath. The number of hours for which Mr. Reinstein seeks compensation does not include time spent trying to secure co-counsel.

evidence presented in this case;[8] he also assisted Drinker in their representation of plaintiffs on some difficult legal issues, and drafted many of the numerous documents supportive of their position.[9]

Mr. Reinstein has billed his time at an hourly rate of $40. Considering the highly technical area of the case for which he was responsible, his position as a full professor of law at Temple University, and the fact that the hourly fee he requests is less than the fee suggested by the Philadelphia Bar Association's minimum fee schedule, $40 is a fair and reasonable hourly rate.

Mr. Reinstein's affidavit and subsequent supplemental memoranda filed jointly with Drinker avers that he has devoted a total of 1143.75 hours to the preparation, litigation and partial settlement of this case. Defendants' Answer argues that Mr. Reinstein's work was not actually necessary to the proper conduct of the case, and that it was duplicative of Drinker's work. These arguments are rejected. Mr. Reinstein asserts, and this Court agrees, that a careful division of labor was observed in all phases of the case.

Further, there is no merit in the defendants' contention that Reinstein's award should be reduced to reflect his obstructionism to settlement of the case. This Court need only point to several of its earlier Memoranda and Orders to illustrate the falsity of any such assertion; indeed, it was the defendants who prolonged and complicated the earlier stages of this litigation. *See, e. g., Commonwealth of Pa. v. O'Neill,* C.A. No. 70–3500 (E.D.Pa., Aug. 2, 1974); *id.* (E.D.Pa., Sept. 30, 1972); *id.* (E.D.Pa., Sept. 22, 1972). In the same vein, defendants contend that no award can be made for

work done subsequent to January 19, 1973, the date the defendants submitted their proposed Consent Decree to the Court;[10] they argue that the settlement eventually reached was essentially the same as that submitted in defendants' proposed decree. Short shrift can be made of this contention by comparing the two decrees. The defendants' proposed decree, for example, did not provide for any relief in the interim for members of the plaintiff class; did not provide for any representation on the review panel by persons not employed by the defendants, and did not provide for any revision of the background investigation criteria and procedures. Clearly the plaintiffs were justified in insisting that the Decree cover these matters. In fact, since the entry of the Consent Decree all three matters have been the subject of numerous conferences and Court Orders and the third has only recently been taken under advisement after the conclusion of lengthy hearings of an extremely technical nature.

Having disposed of these few objections, I find that Mr. Reinstein has adequately detailed how the 1143.75 hours were spent, and that, with one minor adjustment, the total number of hours expended was justified in light of the complexity of the case. Mr. Reinstein spent 42 hours preparing and reviewing various materials in support of his petition for fees, *see* Appendix to Joint Supplemental Memo, for which no award of fees can be made, *Lindy II,* 540 F.2d at 111, and he will be credited, therefore, with having expended a total of 1101.75 compensable hours.

In light of the foregoing data and conclusions, Mr. Reinstein would be entitled

---

8. Mr. Reinstein, for example, coordinated that part of the discovery which dealt with the studies of Drs. Siskin and Barrett, questioned them on direct and cross-examined defendants' experts.

9. Mr. Reinstein states that he was primarily responsible for drafting the following documents: the complaint, interrogatories, requests for production of documents, motion for class action and brief in support, briefs in opposition to petition for writ of prohibition (Court of

Appeals for the Third Circuit and Supreme Court), briefs on merits, and petition for rehearing, in the Court of Appeals.

10. Defendants state in their Answer that their proposed consent decree was submitted to the Court on January 10, 1973. That statement is in error. As explained in Drinker's reply to Defendants' Answer, the City's proposed consent decree was submitted to the Court on January 19, 1973.

to the sum of $44,070 as attorney's fees for services rendered during the time period from December 4, 1970, through March 26, 1976.[11] This award must be reduced by the amount of $160, the sum for which Mr. Reinstein has been reimbursed by the City. *See* "Schedule of Attorneys' Fees and Unreimbursed Costs" in either the Joint Supplemental Memo, or the Memo of Updated Time Charges. Mr. Reinstein's total basic award, therefore, is in the sum of $43,910.

### Drinker Biddle & Reath

The Philadelphia-based law firm of Drinker Biddle & Reath bore the major responsibility for representing the plaintiffs; in toto there were six attorneys, three research assistants and one paralegal from the firm who worked on the case. While that number of persons laboring on one case would in some cases be excessive, I am satisfied that in this case there was no unnecessary duplication. The law firm's petitions and its summaries of how the time was spent reveal that these ten persons did not all work on the case at the same time; rather, many worked only intermittently and then only in certain areas of the case. In short, I find that the services rendered by each attorney were necessary to the successful resolution of the case. I also find that the same is true for the work performed by the research assistants and the paralegal.

The time sheets of the firm document a total expenditure of 3565.75 hours by those persons for whose time compensation is sought; not all those hours, of course, are compensable. As previously stated, the application for fees is contained in three separate petitions. The original Petition for Fees was filed in mid-1973, shortly after the entry of the Consent Decree. It requests fees for the first two-and-one-half years of the litigation, from December 4, 1970, to May 22, 1973.[12] The Memorandum supporting the Petition succinctly details the Herculean effort involved in preparing, litigating and settling this case, *see* pp. 1–2, and I agree with its conclusion that the "general scope and magnitude of this litigation was in all respects comparable to large antitrust litigation  .  .  ." *Id.,* p. 2.

In October 1975, the plaintiffs' attorneys filed a Joint Supplemental Memorandum supporting their original Petition for Fees and requesting fees for additional services rendered during the period of time from May 23, 1973, to August 29, 1975. It documented the substantial amount of work done by plaintiffs' counsel subsequent to the entry of the Consent Decree, both in enforcing the provisions of the Decree and in representing plaintiff class members before the background appeals panel.[13]

Two features of the Joint Supplemental Memo deserve noting. A separately bound Appendix to the Memo contains a summary

---

11. The fact that Mr. Reinstein is on retainer as a consultant to the Office of the General Counsel of the NAACP, and that he worked on this case in that capacity, does not require a diminution of his award. *Clark v. American Marine Corp.,* 320 F.Supp. 709, 711 (E.D.La.1970), *aff'd per curiam,* 437 F.2d 959 (5th Cir. 1974). Similarly, it is irrelevant that Mr. Reinstein is employed in a teaching capacity at Temple University Law School. His occupation is that of a lawyer, and the standards for compensation are governed by the principles of *Lindy I* and *II.*

12. Certain portions of the original Petition are no longer relevant to the decision to award fees. The enactment of the Civil Rights Attorneys' Fees Awards Act, for instance, has outdated the legal analysis in the Memorandum in Support of the Petition. Plaintiffs' counsel have also informed the Court that Exhibits

A–D of Schedule I have no present significance.

For the sake of completeness I note an error of omission in the Petition. That is, the entry of the item "Paralegals" on the time sheets, p. 14, by itself would not support an award. It does not state the number of paralegals represented by the salary figure, nor does it reveal the rate of compensation (hourly or otherwise); it is not even possible to determine if the services were rendered in 1971 or 1972. In any event, I find this oversight inconsequential, for the later fees petitions adequately detail the number of paralegals/research assistants, their function, the hours expended, and the rate of compensation.

13. It was at this stage that three of Drinker's summer law clerks were assigned to this case as research assistants. While all of the clerks later became associates at Drinker, only one, William Lehane, continued work on this case.

of the time devoted by each attorney to each major aspect of the litigation; this was helpful to my determination that there was no unjustifiable duplication or makework (Summary of Time Charges). The Joint Supplemental Memo itself contains a schedule which lists the hours worked by, and the requested hourly rates for, each attorney, for all services rendered through August 29, 1975 [14] (Schedule). The Schedule was a handy reference for my independent calculation of the deserved fees.

In October 1976, the plaintiffs' attorneys filed a third memorandum in support of their request for fees, entitled "Plaintiffs' Memorandum of Additional Authorities and Updated Time Charges and Expenses in Support of Their Petitions for Attorneys' Fees" (Memo of Updated Time Charges). This Memo, as its name suggests, updates the prior Petition for Fees by appending an additional time period running from September 1, 1975, through March 26, 1976. It, too, contains time sheets, a schedule of the hours and rates, and a summary of the respective hours devoted by the attorneys to different areas of the case.

Quite significantly, Drinker does not request compensation at its full regular hourly rates. Instead, it seeks fees in the amount of two-thirds of such regular hourly rates, and it represents to the Court that the total amount reached by using the reduced rates represents an award from which the law firm would neither obtain profit nor incur loss. Accepting the two-thirds rates for the purpose of computing the basic fee award,[15] I reserve comment on the significance of this tack until I reach the "multiplier analysis" required by *Lindy II, infra.* I might comment here, however,

that the reduction in the hourly rates more than adequately protects defendants from paying for duplicative services and mitigates any other hazards attendant multiple counsel. *See Oliver v. Kalamazoo Bd. of Education,* 73 F.R.D. 30, 45 (W.D.Mich. 1976).

Having laid the basic foundation upon which an award of fees can be justified, it seems expedient to group those few objections which were raised by the defendants and to deal with them en masse.[16] Two objections, though frequently and variously repeated, do not withstand scrutiny and merit only cursory attention. Defendants deny that all the work done was necessary to the proper conduct of the case, asserting for example that there was an excessive number of attorneys working on the case. In other words, they claim that there was unnecessary duplication of services. I rely on my former findings to the contrary to refute this argument, and add that with the exception of in-chambers conferences, it was only rarely that all attorneys were simultaneously present in court. The documentation of the fees applications allows me to conclude that a sensible division of labor was maintained so that a reduction in the fees award is not warranted. *See* Summary of Time Charges in the Appendix to the Joint Supplemental Memo and in the Memo of Updated Time Charges.

The defendants' other objection seeks a reduction in the award to reflect Drinker's obduracy in reaching settlement. I am satisfied that my previous resolution of this question when raised with regard to Reinstein's award serves to rebut the argument here as well. *See* p. 705, *supra,* and the Joint Supplemental Memo, pp. 36–64.[17]

---

**14.** The heading of the second group of figures in the Schedule, p. 1, contains a potentially confusing typographical error. It should read "through August 29, 1975," not 1974.

**15.** The two-thirds percentage was rounded off to .67 for purposes of calculating the fees.

**16.** The defendants admit that the hourly rates requested in the original fees Petition are both fair and reasonable. Answer to Petition for Counsel Fees, p. 1. Since that time, no con-

trary position has been stated even though plaintiffs' attorneys have twice updated their Petition and have requested increased hourly rates in the process.

**17.** To the extent that the Joint Supplemental Memo is keyed toward justifying an award of fees under the bad faith exception in *Alyeska, supra,* its legal analysis is no longer pertinent. It does, however, thoroughly and accurately chronicle the defendants' contumacious behavior in this case, and it more than refutes the

■ Finally, the defendants deny that the two-thirds rates will generate no profits for Drinker, somewhat contradicting their earlier stance that the rates requested, in the original Petition at least, were fair and reasonable. *See* note 16, *supra.* Without disputing the novelty or complexity of the issues, or the time expended by plaintiffs' attorneys in litigating them, the defendants urge this Court to adopt a parsimonious approach to the awarding of fees. I need not repeat at length what other courts have said in answering similar arguments. It is sufficient to comment that the very purpose of awarding attorneys' fees in civil rights cases is to assure that private enforcement remains available to those citizens who have little or no money with which to hire an attorney. *S.Rep. No.* 1011, 94th Cong., 2d Sess. 2–4 (1976), U.S.Code Cong. & Admin. News, 1976, p. 5908. The amount of the award, therefore, should not be such as to discourage other attorneys from undertaking to attack discriminatory practices. *Schaeffer v. San Diego Yellow Cabs, Inc.,* 462 F.2d 1002, 1008 (9th Cir. 1972). The reasonableness of an individual attorney's requested hourly rates depends, of course, upon that attorney's experience and demonstrated ability or expertise. Such a determination can only be made by separately examining the merits of each attorney's petition for fees.

### Henry W. Sawyer, III

Mr. Sawyer is a senior partner at the Drinker firm. While he worked in many different areas of the case, the majority of his time was concentrated in preparing and reviewing pleadings; preparing and reviewing discovery documents and motions to compel discovery; and in oral consultations with and attendance at conferences of plaintiffs' counsel. *See* Summary of Time Charges in Appendix to Joint Supplemental Memo and in Memo of Updated Time Charges.

His time records show that he spent 290.25 hours during the period of time covered by Drinker's original Petition for Counsel Fees. Although Mr. Sawyer's regular hourly rate at that time was $80, he requests compensation at the hourly rate of $53.60, which is two-thirds the amount of that regular rate.

The Joint Supplemental Memo documents an additional expenditure of time by Mr. Sawyer totaling 32 hours.[18] Due to an increase in his regular hourly rate to $100 during this time period, he requests compensation at the two-thirds rate of $67.

One additional hour is billed by Mr. Sawyer for the time period covered by the Memo of Updated Time Charges.[19] In 1976, Mr. Sawyer's hourly billing rate increased to $120 so that he requests compensation of this one additional hour at the rate of $80.40.

The figure reached by the above calculations must be modified by deleting for each respective time period those hours which were devoted to preparation of the various petitions for counsel fees, for which no

---

defendants' argument that plaintiffs' counsel were in any way responsible for the delay in reaching settlement.

**18.** There appears to be a discrepancy in the number of hours stated to have been expended by Mr. Sawyer during the period of time from May 23, 1973, through August 29, 1975. The Schedule to the Joint Supplemental Memo records 29.75 hours as having been worked and bills the time at $67 per hour. The Schedule in the later and more comprehensive Memo of Updated Charges, however, logs 32 hours at the $67 hourly rate, giving the impression that 32 hours and not 29.75 hours were worked during the time period covered by the Joint Supplemental Memo.

The discrepancy is not attributable to error, but rather to Drinker's deliberate decision to bill the additional 2.25 hours, actually expended after August 29, 1975, at the (lower) rate in effect prior to August 29, 1975. In all probability, the 2.25 hours were toiled after the close of the August 29, 1975 time period, but before the final rate increase took place in 1976. The inclusion of these hours at the lower hourly rate further attests Drinker's assiduous dedication to accurately and honestly present their Petition to the Court.

**19.** As explained in the foregoing note, the amount of time actually worked during this time period was 3.25 hours. Only one hour, however, is being billed at the increased rate which took effect during this time period.

award of compensation can be made. *Lindy II,* 540 F.2d at 111. The Summary of Time Charges in the Appendix to the Joint Supplemental Memo discloses that Mr. Sawyer spent 3.5 hours on the Petition for Counsel Fees, without further designating during which of the two time periods encompassed by the Joint Supplemental Memo this activity was conducted,[20] so that it is impossible accurately to ascertain at what hourly rate this time would have been billed.[21] This Court, therefore, will arbitrarily assign the higher hourly rate of $67 (two-thirds the regular $100 fee) and will reduce the award for that time period accordingly. The Summary of Time Charges in the Memo of Updated Time Charges reveals that Mr. Sawyer spent an additional quarter of an hour preparing the petitions for fees; this time will be deducted at the hourly rate then in effect of $80.40 (two-thirds the regular fee of $120).

Since Mr. Sawyer's regular hourly rates are commensurate with those ordinarily charged by attorneys of his status who are employed by firms comparable in size and reputation to that of Drinker, and he requests only two-thirds of those respective rates, I conclude that Mr. Sawyer is entitled to compensation in the total amount of $17,527.20.

*Alan Klein*

At the time this case began and up through some point in 1976; Mr. Klein was an associate at the Drinker firm; he has since become a partner. Mr. Klein has performed the bulk of work required by this litigation, especially since the entry of the Consent Decree in April 1973, *see* the Summary of Time Charges in the Appendix and in the Memo of Updated Time Charges, and his work has been marked by thorough

preparation and a keen devotion to the plaintiffs' cause.

The Petition for Fees states that Mr. Klein expended 705.75 hours from December 4, 1970, to May 22, 1973, and that such time would have been billed at the hourly rate of $30.15 (two-thirds his regular fee of $45). The Schedule appended to the Joint Supplemental Memo details an additional expenditure of 497.75 hours, for which compensation is requested at an hourly rate of $36.85; the increased rate reflects an increase to $55 of Mr. Klein's regular hourly fee. Finally, the Memo of Updated Time Charges shows that Mr. Klein worked an added 108.25 hours at the hourly rate of $36.85, and 93.25 hours at the increased hourly rate of $40.20 (two-thirds of Mr. Klein's most recent fee increase in 1976 to $60 per hour).

Again, these figures must be modified to extract those hours which were spent preparing the documents in support of Drinker's fee petition. *Lindy II.* The Appendix to the Joint Supplemental Memo indicates that 57 hours of Mr. Klein's time were given to this endeavor, and because no breakdown has been made as to which of the two hourly rates was applicable,[22] this Court selects the higher (two-thirds) rate of $36.85, and will reduce the total award for this time period accordingly. The Memo of Updated Time Charges discloses that Mr. Klein spent an additional 7.5 hours on the matter of fees during the time period from September 1, 1975, through March 26, 1976. Since this time period spans another increase in Mr. Klein's regular hourly rate, from $55 to $60, and the Memo fails to specify at what rate the time spent on fees would have been billed, this Court again selects the higher (two-thirds) rate of $40.20, and an appropriate reduction of the

**20.** The Joint Supplemental Memo covers two time periods in the sense that it subsumes, although it separately lists, the hours that were documented by the initial Petition.

**21.** As indicated earlier, Mr. Sawyer's regular hourly fee increased from $80 in the first period to $100 during the second period, so that the respective two-third rates are $53.60 and $67.

**22.** As explained more fully with reference to the computation of Mr. Sawyer's fee, *supra,* the Joint Supplemental Memo covers two time periods, and in Mr. Klein's case, encompasses an increase in his regular hourly fee from $45 to $55, so that the respective two-third figures would be $30.15 and $36.85.

award for this time period also will be made.

The regular hourly fees charged by Mr. Klein over the six-year period for which compensation is requested are on a parity with those charged by associates in Mr. Klein's position. *Lindy I,* 487 F.2d at 169, and considering the difficulty and novelty of this case, such fees are reasonable in amount. It follows, therefore, that the request for compensation at two-thirds the regular hourly rates is manifestly justifiable.

Upon the basis of the foregoing reasons, Mr. Klein is awarded attorney's fees in the total amount of $44,956.16.

### Amy Davis

Along with Mr. Klein, Ms. Davis played a large role in handling this litigation; she assumed the major responsibilities during Mr. Klein's leave of absence from Drinker when he went to work with the District Attorney's Office. Much of her time was concentrated in preparing pleadings and discovery-related documents; preparing for the preliminary injunction hearing; preparing and reviewing briefs filed in this Court, in the Court of Appeals for the Third Circuit, and in the Supreme Court; and in pursuing the implementation and enforcement of the terms of the Consent Decree.

During the time period covered by the original Petition, Ms. Davis devoted 790.25 hours to this case, for which she requests compensation at the hourly rate of $23.45 (two-thirds her regular hourly fee of $35). Another 252.75 hours were logged for the same time period at the (two-thirds) hourly rate of $26.80, which rate reflects an increase in the early part of January 1973 in her regular hourly fee from $35 to $40.

The Joint Supplemental Memo documents a further expenditure of 71.50 hours billed at the (two-thirds) hourly rate of $36.85; her regular hourly rate had increased to $55 during this time period. She has billed no hours for the time period covered by the Memo of Updated Time Charges.

She spent 4.5 hours on the preparation of the petitions for fees, and a deduction of that time will be made at the highest hourly rate she has billed ($36.85), since the record does not state the rate at which the time ordinarily would have been billed.

Finding that the rates she requests are commensurate with those billed by other associates of her experience and abilities, I award her fees in the total amount of $27,774.01.

### Michael Floyd

Mr. Floyd's role in this case is somewhat mysterious. The original Petition lists a grand total of three-quarters of an hour as having been spent by Mr. Floyd; the Summary of Time Charges classifies the time as having been spent in "Oral consultations with and attendance at conferences of plaintiffs' counsel." Appendix to Joint Supplemental Memo. It is hard to imagine what contribution Mr. Floyd could have made at a conference among plaintiffs' counsel; there is no indication that he was in any other way connected with the preparation or litigation of this case. Left to its own resources, the Court concludes there is an insufficient basis for awarding any fees to Mr. Floyd. His petition will therefore be denied.

### Janet Sonnenfeld

Ms. Sonnenfeld did not join the Drinker corps which was concentrating on this case until 1973. Her principal contributions to the case were in three areas: interviews with plaintiffs, members of the plaintiff class and non-expert witnesses; preparation of background investigation appeals; and communications with plaintiffs and members of plaintiff class. She terminated her employment with Drinker effective December 12, 1975, but her tenure with the Drinker firm was as an associate attorney, and her requested hourly rates reflect that status.

The Joint Supplemental Memo documents an expenditure of 505.5 hours by Ms. Sonnenfeld; the Memo of Updated Time Charges records an additional 9.25 hours.

Her regular hourly fee of $45 remained constant throughout these two time periods, and she requests compensation at the two-thirds rate of $30.15.

The regular hourly fee of $45 is certainly a reasonable figure for an associate attorney with the skills and experience manifested by Ms. Sonnenfeld, and I award total fees for her services in the amount of $15,-519.72.

## William Lehane

Mr. Lehane's initial contact with this case was as a summer law clerk with Drinker;[23] he became an associate in September 1974, assuming new responsibilities commensurate with his entry into the legal profession.

He has billed a total of 88.25 hours during the time period from May 23, 1973, through August 29, 1975. A little more than half of his time was spent on matters related to the background investigation appeals, and such time is of course compensable. The remainder of his time, however, was spent in preparation and review of materials on attorneys' fees, and it is necessary to deduct that time, 41.25 hours, from the award of fees.

Mr. Lehane seeks compensation at the rate of $26.80, a figure which is two-thirds the regular hourly fee of $40. Finding that such a fee falls within a range of fees which are ordinarily charged for young associates' work, and making the deduction for time spent on the fees issue, I award fees in the amount of $1,259.60.

## Research Assistants: Michael Jordan, William Lehane, Kathryn Levering

Mr. Jordan assembled and prepared materials concerning the issue of back pay to which the qualifying named plaintiffs were entitled under the terms of the plaintiffs' settlement of this issue. Summary of Time Charges, in the Appendix to Joint Supplemental Memo. The Schedule to the Joint Supplemental Memo states that Mr. Jordan spent 11.75 hours in this endeavor, and requests compensation at the (two-thirds)

hourly rate of $20.10. Fees have been awarded for the efforts of legal assistants, within the hours assessed at the rate at which such time is billed to the client, if the amount is reasonable. See Dorfman v. First Boston Corp., 70 F.R.D. 366 (E.D.Pa. 1976) (law students: $15/hour). Since large Philadelphia law firms are presently billing their summer associates' work to clients at $25 per hour, I find that the two-thirds request is well within reason, and I award $236.18 for Mr. Jordan's efforts.

Mr. Lehane and Ms. Levering worked a combined total of 78.50 hours. Neither of them is entitled to any award of fees, however, since their entire contribution was in the area of fees.

## Paralegal: Shelly Hayes

Shelly Hayes, a paralegal, worked 29 hours on the case doing legal research during the time period covered by the original Petition, from December 4, 1970, through May 22, 1973. Compensation is requested for her time at the hourly rate of $10.05, which is two-thirds her regular hourly rate of $15.

I find that her work was necessary, and her two-thirds rate is reasonable, Entin v. Barg, 412 F.Supp. 508 (E.D.Pa.1976); Dorfman v. First Boston Corp., supra (paraprofessionals: $20/hour), and I award $291.45 for the services of Ms. Hayes.

## Conclusion: Drinker's Basic Fee Award

The law firm of Drinker Biddle & Reath, upon the basis of the foregoing data and conclusions, would be entitled to attorneys' fees in the amount of $107,564.32. A reduction must be made to credit the City for reimbursements it has made in the amount of $1,257.50. See Schedule in Joint Supplemental Memo or in Memo of Updated Time Charges. The total basic award to Drinker, therefore, is in the sum of $106,306.82.

---

**23.** The hours he accrued as a student are dealt with separately under the category of Research Assistants.

*Multiplier Analysis*

The decision to award fees is not complete without a separate inquiry into two additional factors, the contingent nature of success, and the quality of the attorneys' work. *Lindy I* and *II.*

█ I find that the contingent nature of success faced by the plaintiffs' attorneys entitles them to an increase of the fees as computed above. The complexity of the case, both factually and legally, the dubiousness of the defendants' liability and the difficulty in statistically establishing that liability combined to make the plaintiffs' burden a heavy one. In addition, the attorneys assumed the risk of investing a tremendous amount of hours, overhead and expense without any guarantee of remuneration, and they have, in fact, continued their work for six years without receiving compensation for their efforts. Both Mr. Reinstein and the Drinker firm are to be commended not only for undertaking this difficult and sensitive case, but also for requesting, in Mr. Reinstein's case, only $40 per hour for a multi-year effort, and in Drinker's case, only two-thirds the fees they normally would be entitled to collect.

I have also concluded that the attorneys are entitled to an increase in the basic fee award in compensation for the exceptional quality of their work. Each attorney's respective hourly fee, of course, already represents, in part, compensation for the attorney's experience, knowledge and legal talent. *Lindy II,* 540 F.2d at 117. This award, however, recognizes a degree of superiority above those skills an attorney is expected to have. The benefits conferred upon the members of plaintiffs' class as well as the collateral benefit received by the citizens of the community in having a lawfully selected police force attest to the value of the attorneys' services; that the benefit conferred is nonmonetary is inconsequential. *Merola v. Atlantic Richfield Company,* 515 F.2d 165 (3d Cir. 1975). Plaintiffs' attorneys have continuously sought to streamline and expedite the disposition of this case despite significant obstacles. Their conscientious preparation

and cooperation has been in the highest tradition of the legal profession.

I have concluded that a one-third increase in the basic award is proper to reflect the contingency and quality factors discussed above. Therefore, the sum of $14,490.30 is added to Mr. Reinstein's award, and the sum of $35,081.25 to that of the Drinker firm.

*Conclusion: Total Fee Awards*

In summary, judgment will be entered against the defendants on the Petitions for Counsel Fees, and in favor of Mr. Reinstein in the total amount of $58,400.30, and in favor of Drinker Biddle & Reath in the total amount of $141,388.07.

## II. COSTS

*Statutory Costs*

Mr. Reinstein and Drinker have requested reimbursements of their costs. Costs which are taxable in favor of the prevailing party are outlined in 28 U.S.C. § 1920; there is no doubt that plaintiffs are the prevailing parties, and the attorneys have filed an affidavit which avers that each item contained in the Bill of Costs constituted a necessary litigation expense, and that the amounts sought were, in fact, expended. Affidavit of Henry Sawyer, III in the Appendix to the Joint Supplemental Memo.

The only position which the defendants took on the plaintiffs' right to costs appeared in their Answer to the original Petition. In that Answer, they admitted that the calculations of unreimbursed out-of-pocket expenses were fair and reasonable, with one reservation; they expressed no opinion on the request for reimbursement for duplicating and photocopying costs because rates were not specified nor was the number of pages duplicated stated. While it is always desirable and often necessary for exactitude in such matters as awarding fees or costs, I find that the Bill of Costs evidences the required detail and categorization to justify an award of costs. Statutory costs will be awarded in the amount prayed for, $8,011.20.

*Specially Awarded Costs*

■ The costs in this category are not specifically authorized by statute, and therefore must be addressed by the Court. While there is authority for restricting awardable costs to those enumerated in the costs statute, 28 U.S.C. § 1920, there is an increasing body of decisional authority approving the award of additional costs in cases in which equitable principles warrant an award. I conclude that all of the following requested costs should be awarded in the amount prayed for.

## A. Expert Witness Fees

The defendants correctly argue that generally fees for expert witnesses cannot be recovered as costs. *See* 6 J. Moore, *Federal Practice* ¶ 54.77[5.–3], at 1734 (2d ed. 1948). Recently, however, many courts have awarded expert's fees as costs where the expert's testimony was helpful to the Court and played an important role in the resolution of the issues. *See Wallace v. House,* 377 F.Supp. 1192 (W.D.La.1974), *modified,* 515 F.2d 619 (5th Cir. 1975); *Pyramid Lake Paiute Tribe of Indians v. Morton,* 360 F.Supp. 669 (D.D.C.1973), *rev'd,* 163 U.S. App.D.C. 90, 499 F.2d 1095 (1974), *cert. denied,* 420 U.S. 962, 95 S.Ct. 1351, 43 L.Ed.2d 439 (1975)[24]; *Sims v. Amos,* 340 F.Supp. 691, 695 n. 11 (M.D.Ala.), *aff'd,* 409 U.S. 942, 93 S.Ct. 290, 34 L.Ed.2d 215 (1972); *La Raza Unida v. Volpe,* 57 F.R.D. 94, 102 (N.D.Cal.1972), *aff'd,* 488 F.2d 559 (9th Cir. 1973), *cert. denied,* 417 U.S. 968, 94 S.Ct. 3171, 41 L.Ed.2d 1138 (1974). I am in agreement with these cases insofar as they award expert witness fees as costs.

### 1. Dr. Shelburne's Fee

Dr. Shelburne testified on behalf of Harold Hack who had been rejected as a police candidate because of an alleged heart condition. Subsequent physical examinations disclosed that Mr. Hack had never suffered a heart condition of any kind, and Dr. Shel-

burne's testimony was crucial in establishing Mr. Hack's entitlement to a job as a police officer. As part of the settlement of this case, Mr. Hack was hired by the Police Department.

The City opposes the award of fees to Dr. Shelburne, or at least the amount prayed for. Their contention that this incident did not involve racial discrimination deserves no comment, and the argument that Mr. Hack failed to pursue alternate administrative remedies comes too late in the day; the City advised plaintiffs' counsel of such remedies only after Dr. Shelburne had rendered his professional services.

Dr. Shelburne's usual professional fee for a cardiac consultation and evaluation of the type performed for Mr. Hack is $150; Dr. Shelburne granted Mr. Hack full courtesy of this fee, requesting no compensation for these services due to the nature of the case. His fee for testifying, the preparation therefor, and expenses portal-to-portal would ordinarily be $600, but he requests only $550, having granted another $50 courtesy. *See* Exhibit B to Plaintiffs' Supplemental Petition for Unreimbursed Costs.

Because Dr. Shelburne's services were of some assistance to the Court and counsel in reaching a settlement of plaintiff-Hack's claim, a substantial part of his fee of $550 should be taxed against the defendants. Under the circumstances, I believe $300 is the appropriate amount.

### 2. Dr. Richard S. Barrett's Fee

Dr. Richard S. Barrett, plaintiffs' testing expert, furnished plaintiffs' counsel and the Court with an evaluation of the Educational Testing Service (ETS) report pertaining to the development of a new written entrance examination. He also gave assistance on the determination of a passing score for the new examination, and highlighted the need for a follow-up predictive validity study, for which the City has retained ETS.

**24.** In both the *Wallace* and *Pyramid Lake Paiute Tribe* cases, the district courts' awards of fees were vacated and remanded for consideration of the intervening *Alyeska* decision. What the district courts said about awarding expert witness fees, however, assumed the propriety of an award and the appellate decisions did not question that portion of the opinions.

Dr. Barrett requested and received a professional fee of $125 for his services, and Drinker seeks reimbursement of this amount on the ground that he guided the Court and counsel to a fair and amicable resolution of this difficult issue. This fee will be assessed against the defendants.

### 3. Dr. Bernard R. Siskin's Fee

Statistical evidence is crucial in an employment, discrimination case to establish the discriminatory impact of certain hiring and promotional tests and devices. See, e. g., Albemarle Paper Co. v. Moody, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); Davis v. Washington, 168 U.S.App.D.C. 42, 512 F.2d 956 (1975), rev'd on other grounds, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); [25] Boston Chapter, NAACP, Inc. v. Beecher, 371 F.Supp. 507, 513 (D.Mass.), aff'd, 504 F.2d 1017 (1st Cir. 1974), cert. denied, 421 U.S. 910, 95 S.Ct. 1561, 43 L.Ed.2d 775 (1975).

Dr. Siskin, plaintiffs' statistical expert, has filed an extensive and detailed affidavit describing the services he performed for plaintiffs. See Supplemental Petition for Unreimbursed Costs, Exhibit F. The importance of Dr. Siskin's role in this litigation is evidenced by the prior Opinion of this Court, in which much weight was given to his written reports and testimony on the background investigation and the police entrance and promotional examinations. Commonwealth v. O'Neill, supra, at 1088–89, 1092–1102.

Bernard Siskin is an associate professor and chairman of the Department of Statistics at Temple University, in Philadelphia, and as his resumé attests, he is highly qualified in his field. He has published and performed research in the field of statistics, and he has also served as an expert witness and consultant in other employment discrimination cases. His affidavit states that the customary fee that he receives for consulting purposes is $300 per day. Although he expended more than 60 work days on this suit, and would be entitled to $18,000 at his usual daily rate, he requests $10,000 as the fee for his professional services.

The City objects to Dr. Siskin's request for compensation, and contends that his request is greatly exaggerated. Answer to Supplemental Petition for Unreimbursed Costs, p. 3. The City's first argument is that his fee is exorbitant; they compare the fee charged to the City by its expert, Dr. Bagley, which was $160 for a full day. In the last analysis, however, Dr. Siskin's total fee request of $10,000 averages out to $167 per day, only $7 more than Dr. Bagley's fee. Their second argument is that much of Dr. Siskin's work was done in conjunction with his responsibilities at Temple and benefitted him therein. While I cannot assess the accuracy of such an assertion, I conclude that it is irrelevant to a request for compensation for professional services that actually were rendered on behalf of parties to a lawsuit. Finally, they argue that much of his work was necessitated only after the City pointed out inaccuracies and misconceptions in his proffered testimony. Answer, p. 3. I agree with Drinker that such a characterization of his testimony "demonstrates a remarkable lack of candor on behalf of defense counsel." Drinker's Reply to the Defendants' Answer.

Dr. Siskin's $10,000 fee will be taxed against the defendants as costs.

### 4. Dr. Bernard Cohen's Fee

The plaintiffs' Memo of Updated Time Charges seeks reimbursement for the professional fee and expenses of Dr. Bernard Cohen, who testified on plaintiffs' behalf at a hearing before this Court on March 12, 1976. Dr. Cohen had prepared for the Rand Institute "perhaps the most comprehensive study ever performed on any police background screening device." Memo of Updat-

---

**25.** While the Supreme Court ruled that statistical evidence of discriminatory impact alone cannot conclusively establish a violation of the due process clause, the Court nonetheless recognized the importance of such evidence as relevant to proof of an invidiously discriminatory purpose which is violative of the Constitution.

ed Time Charges, p. 11. Dr. Cohen's testimony, in conjunction with the study itself, fully reflects what can and should be done in validating a background screening procedure such as that utilized by the Philadelphia Police Department. Memo of Updated Time Charges, pp. 11–12.

Plaintiffs submit that Dr. Cohen's professional fee for his appearance and testimony, $300, and his transportation and hotel expenses, $98.80, are reasonable, and they seek reimbursement in the amount of $398.80. This amount will be taxed against the defendants.

*Summary of Expert Witness Fees Allowed*

| | |
|---|---|
| Dr. Shelburne | $ 300.00 |
| Dr. Barrett | 125.00 |
| Dr. Siskin | 10,000.00 |
| Dr. Cohen | 398.80 |

## B. Research Assistants

### 1. Judith Kates

Ms. Kates was a graduate student in communications at the time she assisted plaintiffs' counsel by reviewing background investigation files and assisted Dr. Siskin's preparation of his statistical analysis. Along with her husband, Ralph Kates, Ms. Kates "supervis[ed] a team of students who were to examine the police files, locate all items of derogatory information and report their findings on the coding sheet by making a notation opposite the appropriate category." 348 F.Supp. at 1092. Ms. Kates' request-for-compensation letter to plaintiffs' counsel, Alan Klein, details her efforts in this case, including ordering of the background files, performing an accuracy check on all files, selecting egregious cases, meeting with Dr. Siskin, and compiling a statistical analysis of disciplinary cases from 1966–1971. Plaintiffs' Supplemental Petition for Unreimbursed Costs, Exhibit C.

Ms. Kates represents that she has spent 432 hours working on this case, and she requests an hourly rate of $4.00, so that her total request for compensation is $1,728. She seeks no reimbursement for various miscellaneous expenses and tasks relating to this case. Exhibit C, *supra.* The defendants' objection to an award for Ms. Kates centers on her failure to delineate which services were rendered post-January 19, 1973. I have already dismissed that objection as without merit.

### 2. Ralph Kates

Mr. Kates, now an Assistant Attorney General, was a law student at the time of his involvement in this case. He prepared and reviewed background summaries, and testified several times in the course of the litigation on behalf of the plaintiffs regarding his and his wife's role in supervising the accumulation of data from the police investigation files; the supervision was to ensure the accuracy of the data-gathering process. Joint Supplemental Memo, p. 100; plaintiffs' Supplemental Petition for Unreimbursed Costs, Exhibit B. He represents that he worked a total of 7½ hours, and he seeks compensation at the hourly rate of $25, so that his total fee would be $187.50.

The defendants raise two arguments against a special award for Mr. Kates, only one of which must directly be refuted.[26] They ask the Court for a substantial reduction in the value of his services due to his "misrepresentations on the witness stand," and his partisanship. Defendants' Answer to Supplemental Petition for Unreimbursed Costs, p. 3. This contention lacks merit in light of this Court's earlier finding that Mr. Kates was, indeed, a credible witness who "left no doubt as to his concern for the accuracy of the project." 348 F.Supp. at 1092–93.

### Discussion of the Kates' Requests

The work performed by the Kates was essential to the plaintiffs' case. It was a

---

**26.** Defendants dispute that any of Mr. Kates' efforts are compensable because all the services were rendered post-January 19, 1973. This argument is rejected for reasons previously stated.

time-consuming and exacting task, which if performed by attorneys would have been an extremely expensive process. It was, instead, performed by two capable and concerned graduate students who exercised every caution to ensure accuracy. *See Wallace v. House, supra,* at 1207 (House's fee).

Mr. Kates, being a law student, could have been placed in the category in which Messrs. Jordan and Lehane, and Ms. Levering, were grouped, where his work would have been billed to the client at $30 per hour. Instead, he seeks $25 per hour. His request for compensation at the hourly rate of $25 is reasonable and he will be awarded $187.50 for his services.

Ms. Kates is somewhat in a category by herself, but it seems that the hourly rate of $4.00 is a manifestly reasonable and fair sum for the services of a doctoral candidate; I might add that her services were of an extremely high caliber. The total award for Ms. Kates will be $1,728.

### Summary of Research Assistants' Awards

| | |
|---|---|
| Judith Kates | $1,728.00 |
| Ralph Kates | 187.50 |
| Total | $1,915.50 |

### C. *Keypunching Services*

At various times throughout 1972 and 1973, Drinker paid Dr. Siskin, their statistical expert, for the services of keypunch operators who placed on computer cards data which had been accumulated from the defendants' files and records by the plaintiffs' student researchers. Joint Supplemental Memo, p. 88. Most of such keypunch services had been performed by Fimaco, Inc., and although the Commonwealth of Pennsylvania eventually reimbursed Drinker (through Dr. Siskin) for most of this expense, there are presently invoices outstanding in the amount of $597.94, for which Drinker seeks reimburse-

ment.[27] Joint Supplemental Memo, pp. 95–96. The defendants admit, with one, unimportant distinction, that such services were necessary.[28] Defendants' Answer to Supplemental Petition for Unreimbursed Costs, p. 2.

The information placed onto the punchcards was subsequently programmed by Dr. Siskin to produce the data upon which he relied in his testimony; this data was found to be sufficient as a matter of law to reveal a pattern of racial discrimination in the Police Department's hiring and promotion practices. Joint Supplemental Memo, p. 89. Without the keypunching services, Dr. Siskin's lucid presentation would not have been possible, and trial would have been inordinately delayed. Joint Supplemental Memo, p. 89. I find that these services were both essential to the establishment of the plaintiffs' case, and invaluable to the Court's fact-finding process. The total cost of the keypunch services was $9,652.50; the Commonwealth of Pennsylvania has reimbursed Drinker in the amount of $7,643.50, so that the total award to Drinker will be $2,009.00.

### Keypunch Services Award

| | |
|---|---|
| Fimaco | $ 597.94 |
| Other keypunch costs | 2,009.00 |

### D. *Amount Owing the Delaware Valley Regional Planning Commission*

In order for Dr. Siskin to ascertain the racial composition of police applicants, it was necessary to obtain certain materials and data from the Delaware Valley Regional Planning Commission, since the Police Department kept no racial records. Dr. Siskin's approach and conclusions in this matter were accepted by this Court, 348 F.Supp. at 1088–89, and supported plaintiffs' contention that the written entrance examinations had a disproportionate ad-

---

**27.** The invoices from Fimaco, Inc. which are attached to the Supplemental Petition for Unreimbursed Costs, total up to $598.60. There is no explanation for the discrepancy, and I will

award only the amount that their Memo states is outstanding.

**28.** The defendants dispute the necessity of services post-January 19, 1973.

verse impact upon blacks. Joint Supplemental Memo, pp. 94–95.

Plaintiffs seek reimbursement of the $160 still owing to the Commission. Supplemental Petition for Unreimbursed Costs, Exhibit E. The defendants admit the necessity of these services, Answer to Petition for Unreimbursed Costs, p. 2, and the cost will be awarded against the defendants.

Award to Planning
    Commission:             $160.00

### E. "Contract Service Fee" for Dr. Howard E. Mitchell

When the City had for many months failed to compensate Dr. Howard E. Mitchell for his services on the special review panel, Drinker prepared a contract setting forth his rate of compensation and other terms, as suggested by Sheldon Albert, then Chief Deputy City Solicitor. The contract was forwarded to Mr. Albert for the signature of the appropriate City officials on September 3, 1974, after Dr. Mitchell had approved it. Despite numerous inquiries by plaintiffs' counsel as to the contract's status, it was not signed until an Order from this Court issued directing the City to deliver an executed contract to Dr. Mitchell or to post security of $5,000 to cover his future fees. Transcript of October 17, 1974 hearing, pp. 114, 157.

The City thereafter executed a contract with Dr. Mitchell, which was in the form of the one initially prepared by Drinker, and charged Drinker a "contract service fee" of $15. In order to avoid further delay or inconvenience to Dr. Mitchell, Drinker paid this fee. The mere recitation of these facts reveals the justness of awarding this expense to plaintiffs' counsel.

Award of Contract
    Service Fee:            $15.00

### Conclusion: Total Costs Award to Drinker

Statutory costs will be awarded in the amount of $8,011.20 and a special award of

costs will be awarded in the sum of $15,521.24.

### Commonwealth's Petition for Unreimbursed Costs

The Commonwealth also seeks both statutory and non-statutory costs.

### Statutory Costs

The Commonwealth seeks to recover costs it expended for depositions, transcripts, duplicating and other miscellaneous expenses. See Commonwealth's Petition for Unreimbursed Costs, Schedule II. I find that those costs listed in the Petition that are recoverable under 28 U.S.C. § 1920 were both reasonable and necessary expenses of litigation, and I conclude that the Petition supports the Commonwealth's claim for its unreimbursed statutory costs in the amount prayed for, $2,798.80.

### Specially Awarded Costs

The Commonwealth seeks to recover the monies it expended in compensating its expert witnesses, Drs. Barrett and Siskin, for their pre-Consent Decree work. I am concerned about possible unnecessary duplication in this respect,[29] and am influenced, too, by the special relationship between the Commonwealth and a municipality. I therefore decline to award the claimed additional costs.

### Conclusion: Total Costs Awarded to Commonwealth

Statutory costs will be awarded in the amount of $2,798.80.

### CONCLUSION

◼ In conformity with the views expressed above, the firm of Drinker Biddle & Reath is entitled to an award of $141,388.07, together with $8,011.20 in costs and $15,521.24 in expenses, making a total award of $164,920.51. Mr. Reinstein is entitled to an

---

29. I have been assured that, in this particular instance, the Commonwealth's request for costs for the services of Drs. Barrett and Siskin does not duplicate that of Drinker Biddle & Reath.

award of $58,400.30. The Commonwealth is entitled to an award of $2,798.80 to cover its costs.

I have also concluded that final judgments should be entered at this time. While litigation concerning the validity of the new tests, both entrance and promotional, and the new background investigation criteria and procedures is continuing under the same docket number, the litigation covered by these fee applications, namely, the proceedings leading to the entry of, and subsequent enforcement of, the Consent Decree, was actually a separate chapter which has now been closed. No useful purpose would be served by delaying the entry of a final judgment for counsel fees covering that chapter of the litigation.

APPENDIX

### Computation of Basic Attorneys' Fees Award

|  | Hours | Hourly Rate | Fee |
|---|---|---|---|
| **Reinstein** | | | |
| 12/4/70–5/22/73 | 876.00 | $40.00 | $35,040.00 |
| 5/23/73–8/29/75 | 267.50 | 40.00 | 10,700.00 |
| 9/1/75–3/26/76 | .25 | 40.00 | 10.00 |
| | | | $45,750.00 |
| Less: 4/12/70–8/29/75 | 42.00 | 40.00 | − 1,680.00 |
| | | | $44,070.00 |
| Less Reimbursement by City: $160 | | | − 160.00 |
| | | | $43,910.00 |

| **Drinker Biddle & Reath** | | | |
|---|---|---|---|
| **Sawyer** | | | |
| 12/4/70–5/22/73 | 290.25 | $53.60 (⅔ x $80) | $15,557.40 |
| 5/23/73–8/29/75 | 32.00 | 67.00 (⅔ x $100) | 2,144.00 |
| 9/1/75–3/26/76 | 1.00 | 80.40 (⅔ x $120) | 80.40 |
| | | | $17,781.80 |
| Less: 12/4/70–8/29/75 | 3.50 x | 67.00 = $234.50 | |
| 9/1/75–3/26/76 | .25 x | 80.40 = 20.10 | |
| | 3.75 hrs. | $254.60 | − 254.60 |
| | | | $17,527.20 |

| **Klein** | | | |
|---|---|---|---|
| 12/4/70–5/22/73 | 705.75 | 30.15 (⅔ x $45) | $21,278.36 |
| 5/23/73–8/29/75 | 497.75 | 36.85 (⅔ x $55) | 18,342.09 |
| 9/1/75–3/26/76 | 108.25 | 36.85 (⅔ x $55) | 3,989.01 |
| 9/1/75–3/26/76 | 93.25 | 40.20 (⅔ x $60) | 3,748.65 |
| | | | $47,358.11 |

Less:  12/4/70–
8/29/75                    57.00  x    36.85 = $2,100.45

9/1/75–
3/26/76                     7.50  x    40.20 =    301.50
                                                 $2,401.95

                                                            – $2,401.95
                                                              $44,956.16

Davis
12/4/70–5/22/73          790.25     23.45 (⅔ x $35)          $18,531.36
12/4/70–5/22/73          252.75     26.80 (⅔ x $40)            6,773.70
5/23/73–8/29/75           71.50     36.85 (⅔ x $55)            2,635.78
                                                             $27,939.84

Less:  5/23/73–
8/29/75                     4.50  x    36.85 = $165.83        –   165.83
                                                             $27,774.01

Floyd
12/4/70–5/22/73             .75     33.50 (⅔ x $50)           ——

Sonnenfeld
5/23/73–8/29/75          505.50     30.15 (⅔ x $45)           15,240.83
8/29/75–3/26/76            9.25     30.15 (⅔ x $45)              278.89
                                                             $15,519.72

Lehane
5/23/73–8/29/75           88.25     26.80 (⅔ x $40)          $ 2,365.10

Less:  5/23/73–
8/29/75                    41.25  x    26.80 = $1,105.50      – 1,105.50
                                                             $ 1,259.60

Research Assistants
Michael Jordan
5/23/73–8/29/75           11.75     20.10 (⅔ x $30)          $    236.18

William Lehane
5/23/73–8/29/75           10.00     20.10 (⅔ x $30)          $    201.00

Less:  5/23/73–
8/29/75                    10.00  x    20.10 = $201.00       –    201.00

| Kathryn Levering | Hours | Hourly Rate | Fee |
|---|---|---|---|
| 5/23/73–8/29/75 | 68.50 | 20.10 (⅔ x $30) | $ 1,376.85 |
| Less: 5/23/73–8/29/75 | 68.50  x  20.10 = $1,376.85 | | − 1,376.85 |

Paralegal
Shelly Hayes

| 12/4/70–5/23/73 | 29.00 | 10.05 (⅔ x $15) | $ 291.45 |

|  | SUBTOTAL: | 107,564.32 |
|---|---|---|
| Less Reimbursement by City: | | − 1,257.50 |
|  | TOTAL: | $106,306.82 |

### Computation of Complementary Attorneys' Fees Awards

Reinstein

| Basic Fee Award | $ 43,910.00 |
|---|---|
| Contingency and quality bonus ($43,910 x .33) | 14,490.30 |
| TOTAL FEE AWARD | $ 58,400.30 |

Drinker Biddle & Reath

| Basic Fee Award | $106,306.82 |
|---|---|
| Contingency & Quality Bonus ($106,306.82 x .33) | 35,081.25 |
|  | $141,388.07 |

### Computation of Costs: Drinker and Commonwealth

Clerk's Costs

| 12/4/70–5/22/73 | $ 5,792.94 |
|---|---|
| 5/23/73–8/29/75 | 911.66 |
| 9/1/75–3/26/76 | 1,306.60 |
| SUBTOTAL | $ 8,011.20 |

Special Awards

Expert Witnesses

| Dr. Shelburne | $300.00 |
|---|---|
| Dr. Barrett | 125.00 |
| Dr. Siskin | 10,000.00 |
| Dr. Cohen | 398.80 |

| Research Assistants | Fee |
|---|---|
| Judith Kates | $1,728.00 |
| Ralph Kates | 187.50 |

| Keypunch Services | |
|---|---|
| Fimaco, Inc. | $597.94 |
| Keypunch services, in general | 2,009.00 |

| Miscellaneous | |
|---|---|
| Delaware Valley Regional Planning Comm'n | $160.00 |
| Dr. Howard E. Mitchell's "contract service fee" | 15.00 |
| SUBTOTAL | $15,521.24 |
| TOTAL COSTS | $23,532.44 |

### Computation of Costs: Commonwealth

| Clerk's Costs | $ 2,798.80 |
|---|---|

---

## ORDER

AND NOW, this 28th day of April, 1977, it is ORDERED that the petitions of Drinker Biddle & Reath, Robert Reinstein, and the Commonwealth of Pennsylvania, seeking awards of counsel fees, costs and expenses of this litigation during the period up to and including March 26, 1976, are GRANTED and allowed as follows:

—To the law firm of Drinker Biddle & Reath

| Counsel fees | $141,388.07 |
|---|---|
| Expenses | 15,521.24 |
| Costs | 8,011.20 |
| | $164,920.51 |

—To Robert J. Reinstein

| Counsel fees | 58,400.30 |
|---|---|

—To the Commonwealth of Pennsylvania

| Costs | 2,798.80 |
|---|---|

It appearing to the Court that there is no just reason for delay, the Clerk is directed to enter Final Judgment in favor of the law firm of Drinker Biddle & Reath and against the defendant City of Philadelphia in the sum of $164,920.51; in favor of Robert J. Reinstein and against the defendant City of Philadelphia in the sum of $58,400; and in favor of the Commonwealth of Pennsylvania and against the defendant City of Philadelphia in the sum of $2,798.80.